581 So.2d 738 (1991)
In the Matter of AMERICAN WASTE AND POLLUTION CONTROL COMPANY.
No. CW 90 1581.
Court of Appeal of Louisiana, First Circuit.
May 16, 1991.
*739 Gerald L. Walter, Jr., Schwab & Walter, Baton Rouge, La., for appellant.
John King, Office of Legal Affairs and Enforcement, Baton Rouge, La., for appellee State of La. thru the Dept. of Environmental Quality.
Before LOTTINGER, SHORTESS and CARTER, JJ.
LOTTINGER, Judge.
From a judgment recusing Dr. Paul Templet, Secretary of the Department of Environmental Quality, from acting as the hearing officer in the American Waste and Pollution Control Company permit application hearings, the Department of Environmental Quality (hereafter DEQ) and Dr. Templet seek writs to review that judgment. They also seek review of the judgment denying its motion for appeal. Without ruling on the merits of the writ application, this court, on December 20, 1990, issued a Writ of Certiorari directing the transmittal of the record in this proceeding and at the same time setting this matter for argument.

FACTS
American Waste and Pollution Control Company (hereafter American) filed an application for a permit with DEQ. In the course of those proceedings, American Waste requested that Dr. Templet be recused for alleged bias or having prejudged the case. American's motion to recuse was denied by Dr. Templet. American then sought supervisory writs from this court. (Docket No. CW 89 1668.) Pursuant to that writ application, this court on October 13, 1989, reversed the denial and ordered that a hearing be conducted to determine whether Dr. Templet should be recused.[1] On an application for rehearing of that writ application and order, this court on November 15, 1989, denied the rehearing and clarified its original order.[2] Thereafter, the Honorable Paul B. Landry, Jr. (hereafter Hearing Officer) was appointed Secretary Ad Hoc to decide the issue of Dr. Templet's recusal.
Testimony was given by the following interested witnesses: Robert J. Bodin, Sr., Mayor of New Iberia; Craig Romero, President of the Iberia Parish Police Jury; and Charles Pasqua, Executive Director of the Louisiana Municipal Association. Each testified that they heard Dr. Templet say that the permit would not be granted because it was a "political hot potato." Similar testimony was given by one of the DEQ's own witnesses, Wayne Labiche.
Although not specifically told by Dr. Templet that he had not reached a decision, Mr. Dee Stanley, a Lafayette television reporter, after interviewing Dr. Templet, was left with the impression that Dr. Templet *740 had problems with the Cade II site selection and with the local opposition.
Dr. Templet denied any bias or prejudice with respect to this matter. American contends that Dr. Templet has prejudged the matter. On the other hand, Dr. Templet denies having reviewed the application, having discussed the merits of American's application with members of his staff, or having reached a decision to deny the permit. Testimony given by Mr. Pasqua contradicts Dr. Templet's assertion as to the prejudgment issue. Mr. Pasqua testified that Dr. Templet informed the Governor of his concern over the site location and environmental effect of the project. However, Dr. Templet's alleged concern over the possible adverse environmental effect of Cade II on the Chicot Aquifer conflicts with his prior permitting of the St. Mary Parish landfill and others in the same area which do not have the manufactured or engineered protective liners, as are called for in the Cade II specifications.

HEARING OFFICER'S FINDINGS
The Hearing Officer found that Dr. Templet was mistaken with respect to his testimony denying knowledge and prior discussion of the merits of American's application. Dr. Templet's actions in this matter were guided by his concern over public reaction to the project. In his reasons for granting the recusal,[3] the Hearing Officer concluded that:
[T]he aura created by Director's (sic) [Secretary's] public and private remarks concerning the application in question, eliminates the appearance of complete fairness and objectivity on his part. The Hearing Officer further concludes that it would be extremely difficult for persons of normal sensibilities to accept the premise that Director's (sic) [Secretary's] impartiality is totally unsuspect. (emphasis added).
In light of the circumstances surrounding this permit application, the Hearing Officer found that it would be impossible for Dr. Templet to conduct the remainder of the application proceedings in an "atmosphere presenting an appearance of complete fairness." Therefore, he ordered the recusal of Dr. Templet.
Following this decision, a motion for appeal was filed by the DEQ and Dr. Templet, separately with the Hearing Officer. Each of these motions was denied. The Hearing Officer found that the Department did not have the right to appeal from the interlocutory order recusing Dr. Templet. From the order recusing Dr. Templet, the DEQ is asking that an appeal be granted and, alternatively, that this court grant writs and reverse the recusal.

ASSIGNMENTS OF ERROR
DEQ argues that the Hearing Officer erred by ordering the recusal of Dr. Templet and subsequently denying its motion for appeal from the disqualification order.

DENIAL OF MOTION FOR APPEAL
DEQ argues that it was improper for the Hearing Officer to deny its motion for appeal on the basis that it does not constitute a final decision. The Hearing Officer was appointed solely to determine whether Dr. Templet should be disqualified from hearing American's permit application. The only decision to be made by the appointed hearing officer was with regard to the recusal. Therefore, DEQ contends that the Hearing Officer's decision represents a final decision on this issue and is appealable.
Only final judgments may be appealed. Final judgments are those judgments that determine the merits of the action. La. Code Civ.P. art. 1841. Courts have held that the recusal of a judge is not a final judgment because it does not decide the merits of the case. Long v. ABC Insurance Company or Companies, 462 So.2d 252 (La.App. 4th Cir.1984), writ denied, 463 So.2d 604 (La.1985). The holding in Long can be applied by analogy to the recusal of an administrative officer.
The recusal is not the right of the action which American seeks to enforce. American's underlying action pertains to the merits of the permit application. The *741 filing of a motion for recusal is simply a preliminary matter utilized by American to enforce its right to have a fair hearing by a fair and impartial hearing officer. The recusal of Dr. Templet does not decide the merits of the issuance of the permit. It only decides whether the Dr. Templet can sit on the permit application and decide it fairly. Therefore, it is not a final judgment, and thus it is not appealable.

RECUSAL DECISION
DEQ contends that the Hearing Officer erred in basing his decision on grounds other than those enumerated within La. Code Civ.P. art. 151.[4] On October 13, 1989, this court ordered the Secretary of DEQ to hold an evidentiary hearing on the issue of his recusal considering the grounds set forth in La.Code Civ.P. art. 151. In directing that the hearing officer consider those grounds enumerated in article 151, it was not the intention of this court that the hearing officer's consideration be limited solely to these enumerated grounds.
In rendering the recusal decision, the Hearing Officer concluded that the statements made by Dr. Templet as to the Cade II application eliminated the "appearance of complete fairness and objectivity" in these proceedings. "Not only must there be impartiality on the part of a presiding officer in an administrative adjudication hearing, but there must also be in connection with the hearing the appearance of complete fairness." Matter of Rollins Environmental Services, Inc, 481 So.2d 113, 119 (La.1985) (footnotes omitted).
The "appearance of complete fairness" is placed at issue in these proceedings as a result of private and public statements made by Dr. Templet. The testimony and sworn affidavits of Mayor Bodin and Mr. Romero established that Dr. Templet had decided to deny the permit because he considered it to be a "political hot potato." Both testified that Dr. Templet also informed them of the existing "environmental concerns" presented by this application due to the proximity of the Chicot Aquifer. Testimony given by Mr. Wayne Labiche, Dr. Templet's witness, corroborates the fact that Dr. Templet had publicly stated to a group assembled near the elevator by his office that the permit issue seemed "like a political hot potato."
Dr. Templet's testimony was internally inconsistent with respect to the issue of whether he had knowledge of technical information about the permit, whether he had instructed his staff to prepare a denial of the permit application, and whether he had concerns over the presence of the Chicot Aquifer. Dr. Templet specifically denied ever having stated that American's application was a "political hot potato," despite the existence of contrary evidence. Testimony given by Mr. Pasqua contradicts Dr. Templet's denial of having reviewed the application. Mr. Pasqua testified that he, Dr. Templet, and Mr. Bodin discussed the merits of the permit application in their July 13, 1989 meeting.
Due process requires that the parties to an administrative hearing be afforded a fair trial. After considering the evidence, the Hearing Officer found "that the aura created by Director's (sic) [Secretary's] public and private remarks concerning the application in question, eliminates the appearance of complete fairness and objectivity on his part." When acting as adjudicators, administrative officers should conduct themselves as judges do. We realize that administrative officers on occasion find themselves serving in a dual role. They serve as the head of an agency in the executive branch of government and must be advocates of issues handled by their departments or agencies as well as being involved in political and/or public issues.
At the same time, however, they also serve in a quasi judicial role as adjudicators called upon to decide matters of great public interest and concern in a fair and impartial manner. They do not have the luxury *742 of divorcing themselves from the political arena as do judges. However, they must realize the importance of the positions of public trust they hold and endeavor, however difficult, to avoid any appearance of partiality or prejudgment of matters either pending or to be pending before them. The appearance of impartiality and fairness is just as important as being impartial and fair and is essential to maintaining the integrity of the administrative process. Therefore, it is necessary that hearing officers refrain from making comments on matters that are or will be before them.
Considering the statements made by Dr. Templet, it is "extremely difficult for persons of normal sensibilities to accept the premise that Director's (sic) [the Secretary's] impartiality is totally unsuspect." The evidence clearly demonstrates that the Hearing Officer was not arbitrary, capricious, or manifestly erroneous in finding that Dr. Templet should be recused. See La.R.S. 49:964(G)(5) and (6).
Therefore, for the above and foregoing reasons, the judgment recusing Dr. Templet, Secretary, Department of Environmental Quality, as hearing officer in this matter and denying an appeal is correct. The application for writs is denied.
WRITS DENIED.

APPENDIX

State of Louisiana

Department of Environmental Quality

In The Matter Of:

APA-AW89-001

American Waste and Pollution Control Company

Proceeding Under Louisiana Administrative Procedure Act La.R.S. 49:950, ET SEQ.

July 5, 1990.

DECISION OF HEARING OFFICER ON THE MOTION TO RECUSE DR. PAUL TEMPLET, DIRECTOR, DEPARTMENT OF ENVIRONMENTAL QUALITY, AS HEARING OFFICER IN THIS MATTER.
American Waste and Pollution Control Company (American) filed a motion to recuse Dr. Paul Templet, Director, Department of Environmental Control (DEQ), State of Louisiana, (Director) as Hearing Officer to pass upon American's Application APA-AW90-001, filed February 2, 1988, for a permit to construct a solid waste (garbage) disposal landfill, In Iberia Parish, known in the vernacular as Cade II.
The facility proposes to replace a presently unpermitted similar installation serving the Parishes of Iberia, St. Martin, and Lafayette exclusive of the City of Lafayette.
Director's recusal is premised on the allegation he is biased against issuance of the permit and has predetermined that the permit will be denied notwithstanding Director has not reviewed the completed application file prepared by his staff which has approved the application and recommended that the permit be granted.
More particularly, American alleges that on several occasions Director has stated he would not grant the permit for Cade II because it was a "political hot potato. It is also contended that on more than one occasion Director has informed members of his staff and others interested that he would deny the permit despite repeated alleged statements that Director has not reviewed the file in question.
The record discloses that during the period 1980-1988, solid waste disposal for the area to be served by Cade II, has posed a serious problem for the governmental entities affected. For some time during this period the New Iberia landfill, situated in Iberia Parish, served the area in question. This landfill as well as Cade II overlies the Chicot Aquifer which furnishes water for the area involved herein and other areas as well, a matter of some concern to DEQ. For this reason DEQ sought to terminate the New Iberia permit because it posed a threat to the Chicot Aquifer. The permit for the New Iberia Landfill was renewed annually while an alternative site was considered and explored. Ultimately, DEQ set *743 a final closing date for New Iberia landfill as of April 30, 1990;
Understandably, closure of the New Iberia Landfill was a matter of grave concern to the governmental entities in the affected areas. The crisis prompted negotiations between the authorities involved and American for construction of a replacement fill as soon as possible and, more particularly, a facility situated such as to minimize transportation costs.
Prior and subsequent to filing application for Cade II, officials of the Parishes and municipalities involved and representatives of American, met with Director and his staff concerning the matter.
The record establishes that normally an application for permit is reviewed by DEQ staff for format, technical engineering, geochemical and environmental aspects related to the proposed facility. Deficiencies noted are noticed to applicant who is afforded opportunity to correct same. When required corrections are made and the file deemed complete, DEQ calls a public meeting required by law, following which the matter is held open for thirty days to allow public comment and input. Upon expiration of the thirty day period, DEQ staff again reviews the matter to determine whether additional information, data or requirements are called for. When the file is deemed complete after public hearing, recommendations are made by the head of each DEQ department involved and the application sent to the Director for decision.
The public meeting required for Cade II was held April 3, 1989. Public interest in the project was intense and widespread in that an estimated 1500 persons attended.
According to DEQ staff the file on Cade II was complete and ready for submission to the Director in November, 1989, for decision. All department heads reported that there were no technical objections to granting the permit.
Following the public hearing Robert J. Bodin, Sr., Mayor, New Iberia, Craig Romero, President, Iberia Parish Police Jury, and Charles Pasqua, Director, Louisiana Municipal Association, and other interested parties made repeated inquiries as to the status of the project and were informed the file was not complete. Continued inquiries resulted in increasingly noncommittal responses.
In February, 1989, Bodin and Romero met with Director in Directors office, and with others present, discussed Cade II in detail. Director made no decision.
According to Romero, when the conference ended, he and Bodin remained with Director. Romero being anxious for a decision asked Director specifically whether or not the permit would be granted. Director then leaned over and told Romero "its a political hot potato".
Bodin's version of the incident differs slightly from Romeros'. According to Bodin, as he and Romero were leaving, they both stood in the doorway of Director's office shoulder to shoulder, eye-ball to eye-ball with Director when Romero asked Director if the project would be permitted. Director replied he had serious environmental concerns about the bottom (liner) of Cade II as it relates to the Chicot Aquifer and beyond that the matter was a "political hot potato".
In essence Romero testified he first thought Director was jesting when he used the term "political hot potato", but subsequent events convinced him that Director was serious and that Romero later became convinced the remark was intended to mean the permit would be denied.
Representing the City of New Iberia, Charles Pasqua, met with Director in Director's office on July 13, 1989, in regard to Cade II, with Director's Executive Secretary, Joel Lindsey, also present. At this meeting a telephone conference was held between Director, Pasqua and Bodin during which Cade II was discussed but no resolution reached. Following this conference Pasqua testified he specifically asked Director if Cade II would be permitted and Director responded it would be denied.
Director admitted the meeting and telephone conference but denied telling Pasqua the permit would be denied. Lindsey's testimony also concedes the conference but he *744 did not recall Director telling Pasqua the permit would be denied.
Craig Romero also testified that in 1989, a meeting was held with Governor Roemer, at which the permit application for Cade II was discussed. At this meeting Director informed the Governor that the project was too close to the Chicot Aquifer and the possibility of contamination too great for him to issue the permit which was the reason the permit had not been granted.
Director denied having made this remark to the Governor and insisted that in effect he had not reviewed the file at that time and spoke of the project only in generalities.
Bernard Chaillot, reporter, Daily Iberian, interviewed Romero on September 14, or 15, 1989, concerning Director's alleged use of the term "political hot potato". As a result of the interview, Chaillot published an article in the September 15, 1989, issue of the newspaper. In effect the article stated that Romero felt Director's use of the term "political hot potato" was intended to mean the permit application was politically sensitive, not that Director had decided to deny the permit.
On August 22, 1989, after or during a meeting of LRRDA, a state agency created to study and make plans for environmental controls, of which Pasqua and Director were both members, Director was interviewed by Dee Stanley, employee, Television Station KLFY, Lafayette, Louisiana, concerning the status of Cade II. Chaillot testified that Director told him that no decision had been reached and no alternative site had been selected. Stanley left with the impression that Director had problems with the site for Cade II and that Director also had a problem with the number of persons living in the area who opposed the site. After interviewing Director, Stanley interviewed Romero and Bodin both of whom confirmed their statements regarding Director's use of the term "political hot potato".
Wayne Labiche, self-employed civil engineer, in the capacity of consultant for Iberia Parish, attended a meeting on May 18, 1989, in Director's office, numerous other interested parties being also in attendance. Upon closing of the meeting a small group met outside Director's reception room. At this point Labiche heard Director make the statement that the permit "seems like a political hot potato". Labiche interpreted the remark as being in the nature of an aside. Later, Labiche met with Director and reminded Director of his use of the term "political hot potato" and Director responded that he did not recall making such a remark. Labiche added that Director made the same remark a second time in the presence of a group assembled near the elevator.
Cheryl Albrecht, reporter for the Daily Advertiser, Lafayette, Louisiana, attended a meeting on January 24, 1990, at which Director was present. Her recorded notes indicate that Director stated he had reached a decision on Cade II, but the then pending motion to recuse him as Hearing Officer precluded further action in the matter until the recusal motion was decided.
Timothy Bob Knight, Permit Program Manager, DEQ, testified that following expiration of the thirty day waiting period commencing with the public hearing held April 3, 1989, about seven or eight issues evolved for further consideration. These issues were considered and disposed of and the file on the application was deemed complete in November, 1989, but at this stage the permit process officially stopped. Later his superior, William Mollere, Administrator, DEQ's Solid Waste Division, requested Knight to prepare both a permit and denial for presentation to Director. Knight asked why should he prepare a denial when no staff member had any technical objection to support a denial recommendation. Mollere responded that he wanted Director to make a decision, wanted to move the matter along and consider the next application. Knight retorted that a lot of work was involved in recommending a permit and he did not want to go through such a lengthy process if the permit was going to be denied. Knight conceded that Mollere did not tell him Director had indicated whether Director would grant or deny the application. Knight deemed this *745 strange because there was no staff recommendation that would warrant denial. Mollere answered that Director was not bound by staff recommendations and that Director's policy was to look at the broad picture.
Mollere's testimony is that in July or August, 1989, he requested Knight to prepare both a permit and denial for presentation to Director although there was no staff recommendation for denial and he himself had none. He just wanted to move the matter along because he knew the then existing landfill was operating with a closing date and Cade II was the only pending application for an alternative site. In July or August, 1989, Knight prepared both a permit and denial, following which Mollere instructed Knight to prepare just a denial. On September 13, 1989, Mollere and Dr. James Hudson Brent, Enforcement Program Manager, Solid Waste Division, DEQ, met with Director concerning the matter. Following the meeting Mollere unilaterally requested Knight to prepare a denial. He added that he never told Knight that Director had ever indicated how he would decide the matter.
Dr. Brent recalled having had frequent meetings with staff members regarding Cade II. At one such meeting Mollere instructed Knight to prepare both a permit and a denial, to which Knight replied this would be quite a task. Brent believes that in early September, 1989, Mollere instructed Knight to prepare a denial. Later on that same day he, Knight and Mollere met in Director's office, at which time Knight informed Director that the staff had no technical basis for denial. Director stated he had to consider factors other than staff recommendations and the discussion ended on that note.
Director testified he did not use the term "political hot potato" because it would have been uncharacteristic of him. At another point he indicated that if he did use such language it was taken out of context by those who heard him. In essence, he testified he had not reached a decision on the Cade II application because the file was never complete and had never been submitted for decision. He added that while he would consider staff recommendations, staff opinion and evaluation he was not bound thereby because other factors such as environmental effect have to be considered as part of the whole permit picture. He denied having ever instructed anyone to prepare a permit denial and also denied he had knowledge of the technical details or specific site information concerning the geology involved in the Cade II project.
It appears, however, that at a meeting with Governor Roemer and parties interested in the project, on or about October 30, 1989, Director allegedly told the Governor he had grave environmental concerns regarding Cade II because of its location above the Chicot Aquifer.
The record also establishes that Director granted a permit for the St. Mary Parish and Jefferson Davis Parish landfills over the Chicot Aquifer, neither of which are equipped with a manufactured or engineered liner. Cade II specifications include a system of multiple liners, leachate detection and collection facilities and water management capability not contained in any other landfill sited above the Chicot Aquifer.
Regarding his interview by Chaillot in September, 1989, Director explained that when he told Chaillot he was prepared to render a decision he meant he was prepared to begin the decision making process, not that he had already made his decision.
Director admitted that before becoming Director of DEQ, he acted as consultant to a group which opposed a similar facility proposed by American in the tri-parish area project known as Cade I as well as another facility known as Mid-State in the Alexandria, Louisiana, area. He insisted however, that he had not prejudged the Cade II application and that as Hearing Officer in the matter he could and would render a fair, impartial decision in the matter.
Pertinent to the decision herein are the principles of due process espoused in the Fourteenth Amendment to the United States Constitution and also in Article 1, Section 2, Louisiana Constitution, 1975.
*746 A fair trial and a fair tribunal are indispensable elements of due process. In Re Murchison, 349 U.S. 133, 75 S.C. 623 (1955).
The principles of due process apply as well to administrative agencies which adjudicate, as to the courts. Gibson v. Berryhill, 411 U.S. 564, 93 S.C. 1689 (1973).
The following provisions of LA CCP, Article 151, Section B(4) are also germane to the question at hand:
"B. A judge of any court, trial or appellate shall be recused when he
(5) is biased, prejudiced or interested in the cause or its outcome or biased or prejudiced toward or against the parties or the parties' attorney to such an extent that he would be unable to conduct fair and impartial proceedings."
The issue of application of LA CCP Article 151, Section B(5) to hearings before administrative agencies was squarely put to our Supreme Court in the matter entitled In the Matter of Rollins Environmental Services, Inc., 481 So.2d 113 (La.1985). The court held that the requirements of LA CCP, Article 151, Section 5(5), are grounded on the principle that a fair trial in a fair tribunal are basic elements of due process applicable to administrative agencies exercising adjudicatory power and authority. Rollins, above, extended application of the principle to administrative agencies by stating:
"Not only must there be impartiality on the part of a presiding officer in an administrative adjudication hearing, but there must also be in connection with the hearing the appearance of complete fairness. Impartiality suggests lack of bias, or prejudice or personal interest...."
Concerning the issue of whether preconceived notions constitute bias, Rollins, supra, noted:
"Thus a preconceived position concerning law, policy or legislative fact is not a disqualification. Nor is one disqualified simply by prior exposure to adjudicative facts. Nonetheless disqualification is appropriate for the decision maker who has prejudged the adjudicative facts in dispute."
In this instance Bodin, Romero and Pasqua, witnesses with some interest in the case, testified that Director told them the permit would not be granted because the permit was a "political hot potato". A disinterested witness, Wayne Labiche, called by DEQ, quoted director as having said the matter "seems like a political hot potato".
Dee Stanley, a disinterested witness, testified Director told him Director had reached no decision as of August 22, 1989, but that Director's remarks left him with the impression that Director had problems with the site of Cade II and also with the opposition of local residents to the project.
While Director steadfastly denied any bias or prejudice or having reached a decision to deny the permit, the record contains the contradictions hereinabove noted. Based on the record, the Hearing Officer finds that Director is mistaken in his statements to the effect he never reviewed the record and never discussed the merits of the application with members of his staff.
Director's alleged unfamiliarity with the file on Cade II is contradicted by Pasqua who testified that Director informed the Governor of Director's concern over the site location and environmental effect of the project.
The contradiction between Director's concern over the possible adverse environmental effect of Cade II on the Chicot Aquifer, and his permitting the St. Mary Parish landfill over the same water source, is evident. It is rendered more inexplicable when one notes that the St. Mary Parish landfill and others in the same area have no manufactured or engineered protective liners as are called for pursuant to the specifications for Cade II.
The Hearing Officer concludes that Director's concern over public reaction to the project was the principal reason for what the Hearing Officer finds to be Director's reluctance to make a decision in this matter.
*747 Considering the record compiled in this matter, the Hearing Officer concludes that the aura created by Director's public and private remarks concerning the application in question, eliminates the appearance of complete fairness and objectivity on his part. The Hearing Officer further concludes that it would be extremely difficult for persons of normal sensibilities to accept the premise that Director's impartiality is totally unsuspect.
Consequently, the Hearing Officer finds that Director cannot conduct a hearing on subject application in an atmosphere presenting an appearance of complete fairness.
ACCORDINGLY, IT IS ORDERED, ADJUDGED AND DECREED that judgment be and the same is hereby rendered herein recusing Dr. Paul Templet, Director, Department of Environmental Quality, State of Louisiana, as Hearing Officer in this matter.
Baton Rouge, Louisiana, July 5, 1990.
 /s/Paul B. Landry, Jr.
 Hearing Officer
NOTES
[1] WRIT GRANTED WITH ORDER. In light of the fact that there are no statutory provisions for the recusal of the Secretary of the Department of Environmental Quality [we note La.R.S. 49:964(B) does not contemplate the recusal of the head of a one-member agency such as DEQ], the writ is granted insofar as it relates to the Secretary's refusal to recuse himself. That order is vacated. The Secretary is ordered to hold an evidentiary hearing on the issue of his recusal considering the grounds set forth in Code of Civil Procedure article 151, and he shall render an order based on the evidence produced at the hearing.
[2] REHEARING DENIED. Having reviewed the application for rehearing, this court finds its previous action was correct, except insofar as it cited Louisiana Revised Statutes 49:960(B) as Louisiana Revised Statutes 49:964(B). The action is modified to make that correction, and is also modified as follows: Paul Templet, Secretary of the DEQ, shall hold an evidentiary hearing on the issue of his recusal in this matter. If the Secretary determines that he is to be a witness at the recusal hearing, then he should recuse himself from the hearing and ask the Governor to appoint a Secretary, ad hoc. If he is not to be a witness, he shall render a decision on his recusal. In all other respects, our original action stands.
[3] The full text of the Hearing Officer's findings and decision is attached to this opinion as "Appendix."
[4] La.Code Civ.P. art. 151 provides in pertinent part:

B. A judge of any court, trial or appellate, may be recused when he
(5) Is biased, prejudiced, or interested in the cause or its outcome or biased or prejudiced toward or against the parties or the parties' attorneys to such an extent that he would be unable to conduct fair and impartial proceedings.