633 So.2d 188 (1993)
In the Matter of AMERICAN WASTE AND POLLUTION CONTROL COMPANY.
No. 92 CA 1018.
Court of Appeal of Louisiana, First Circuit.
November 24, 1993.
*189 P. Charles Calahan, New Iberia, Robert L. Boese, Broussard, for War on Waste.
Gerald L. Walter, Schwab & Walter, Baton Rouge, for American Waste & Pollution Control Co., Inc.
Jackie Marve, Ann Coco, Deputy Gen. Counsel, Louisiana Dept. of Environmental Quality, Office of Legal Affairs & Enforcement, Baton Rouge, for appellee.
John C. Holleman, New Iberia, for Episcopal Church of Western Diocese of Louisiana.
Before WATKINS, SHORTESS and FOGG, JJ.
WATKINS, Judge.
On January 9, 1992, William V. Redmann, Secretary pro tempore of the Louisiana Department of Environmental Quality (DEQ) granted to American Waste and Pollution Control Company (American Waste) permit application APA-AW-890001. The grant constituted a permit for the construction, installation, and operation of a proposed solid waste facility at a site in St. Martin Parish known as "Cade II." This appeal was perfected timely[1] by War on Waste and the Acadiana Chapter of the National Audubon Society[2] (hereinafter referred to collectively *190 as "War on Waste"), citizens' groups from the tri-parish area of St. Martin, Iberia, and Lafayette Parishes.

BACKGROUND FACTS
In March of 1985, DEQ initiated a round of public hearings on a proposed landfill site in St. Martin Parish. American Waste's proposed site, known as "Cade I," was outside of St. Martinville, Louisiana, on La. Hwy. 92 in Cade, Louisiana. On February 26, 1987, DEQ Secretary Martha Madden denied the permit based on its geologic proximity to the Chicot Aquifer and the general geologic conditions at the site. The denial stated: "The general geologic conditions at the site are such that engineered solutions are required to overcome natural drawbacks to these conditions. A site where the soils provide more stability, and the natural soils provide a greater degree of protection to groundwater would be preferable."
On November 13, 1987, American Waste submitted another site selection study for a second site in the Cade area, Cade II, located at the intersection of La. Hwy. 182 and Duchamp Road, one and three-tenths miles from the Cade I proposed site. A public hearing on the proposed site for Cade II was held December 15, 1987, at the St. Martinville Senior High School gymnasium. Appellants' members and representatives presented oral and written comments in opposition to the site. Despite local opposition to the geologic inadequacies of the site, the permit application for Cade II was submitted for review. Citizens requested an adjudicatory hearing on the site, but DEQ took no action on the request. Then DEQ lost the records of the December 15, 1987 hearing.
A public hearing on American Waste's application for the Cade II permit was held on April 3, 1989. No adjudicatory hearing was held. Subsequently Secretary Paul Templet was recused from the Cade II case. See In re American Waste & Pollution Control Co., 581 So.2d 738 (La.App. 1st Cir.1991).
Additional insight into the nature of the problem with the Cade II application can be gleaned from the decision of Hearing Officer Paul B. Landry, Jr., who was appointed to decide the motion to recuse Secretary Paul Templet. The decision is a matter of public record and reads in pertinent part:
[D]uring the period 1980-1988, solid waste disposal for the area to be served by Cade II, has posed a serious problem for the governmental entities affected. For some time during this period the New Iberia landfill, situated in Iberia Parish, served the area in question. This landfill as well as Cade II overlies the Chicot Aquifer which furnishes water for the area involved herein and other areas as well, a matter of some concern to DEQ. For this reason DEQ sought to terminate the New Iberia permit because it posed a threat to the Chicot Aquifer. The permit for the New Iberia Landfill was renewed annually while an alternative site was considered and explored. Ultimately, DEQ set a final closing date for New Iberia landfill as of April 30, 1990;

*191 Understandably, closure of the New Iberia Landfill was a matter of grave concern to the governmental entities in the affected areas. The crisis prompted negotiations between the authorities involved and American [Waste] for construction of a replacement fill as soon as possible and, more particularly, a facility situated such as to minimize transportation costs.
....
[N]ormally an application for permit is reviewed by DEQ staff for format, technical engineering, geochemical and environmental aspects related to the proposed facility. Deficiencies noted are noticed to applicant who is afforded opportunity to correct same. When required corrections are made and the file deemed complete, DEQ calls a public meeting required by law, following which the matter is held open for thirty days to allow public comment and input. Upon expiration of the thirty day period, DEQ staff again reviews the matter to determine whether additional information, data or requirements are called for. When the file is deemed complete after public hearing, recommendations are made by the head of each DEQ department involved and the application sent to the Director[3] for decision.
The public meeting required for Cade II was held April 3, 1989. Public interest in the project was intense and widespread in that an estimated 1500 persons attended.
According to DEQ staff the file on Cade II was complete and ready for submission to the Director in November, 1989, for decision. All department heads reported that there were no technical objections to granting the permit.
....
Timothy Bob Knight, Permit Program Manager, DEQ, testified that following expiration of the thirty day waiting period commencing with the public hearing held April 3, 1989, about seven or eight issues evolved for further consideration. These issues were considered and disposed of and the file on the application was deemed complete in November, 1989, but at this stage the permit process officially stopped. Later his superior, William Mollere, Administrator, DEQ's Solid Waste Division, requested Knight to prepare both a permit and denial for presentation to Director....
....
Later on that same day ... Knight informed Director that the staff had no technical basis for denial. Director stated he had to consider factors other than staff recommendations....
Director testified ... he had not reached a decision on the Cade II application because the file was never complete and had never been submitted for decision. He added that while he would consider staff recommendations, staff opinion and evaluation[,] he was not bound thereby because other factors such as environmental effect have to be considered as part of the whole permit picture....
....
[A]t a meeting with Governor Roemer and parties interested in the project, on or about October 30, 1989, Director allegedly told the Governor he had grave environmental concerns regarding Cade II because of its location above the Chicot Aquifer.
The record also establishes that Director granted a permit for the St. Mary Parish and Jefferson Davis Parish landfills over the Chicot Aquifer, neither of which are (sic) equipped with a manufactured or engineered liner. Cade II specifications include a system of multiple liners, leachate detection and collection facilities and water management capability not contained in any other landfill sited above the Chicot Aquifer.
....
The contradiction between Director's concern over the possible adverse environmental effect of Cade II on the Chicot Aquifer, and his permitting the St. Mary Parish landfill over the same water source, is evident. It is rendered more inexplicable *192 when one notes that the St. Mary Parish landfill and others in the same area have no manufactured or engineered protective liners as are called for pursuant to the specifications for Cade II.
The Hearing Officer concludes that Director's concern over public reaction to the project was the principal reason for what the Hearing Officer finds to be Director's reluctance to make a decision in this matter.
....
Consequently, the Hearing Officer finds that Director cannot conduct a hearing on subject application in an atmosphere presenting an appearance of complete fairness.
581 So.2d at 742-746.
In July of 1991, retired Judge William V. Redmann was appointed to render the decision on the permit for Cade II. Secretary pro tempore Redmann granted the permit on January 9, 1992. The following excerpts from his decision are pertinent to this appeal:
Aware that many persons from the general neighborhood of the proposed site oppose its location, but aware too of the public need for such a landfill, and for it to be located somewhere, and of the application's proposals for minimizing its unwelcome impact on the neighborhood;
Informed by the transcript of testimony of the recusal hearing that Department staff at the time of that hearing found no technical deficiency in this application (although no written evaluation or report was part of that hearing) and having obtained, in response to requests for current evaluations, a memorandum from the Program Manager citing no violation of any statute or regulation, and no specific objection except that the site lies above and certain monitors within the extensive and important Chicot Aquifer, which is not afforded maximum protection by those monitors and would be safer under a site where the clay layer overlying the aquifer is thicker;
Satisfied that the earlier-cited Constitutional mandate ... and statutory demand... do not require, and disallow this Department to require, any absolute such as "maximum protection" of air and water resources, but limit demandable protection to that consistent with "the health, safety and welfare of the people" and "programs for the safe and sanitary disposal of solid waste"; and therefore satisfied that Constitution and statutes do not intend that no safe and sanitary landfills be situated above any of this state's widespread aquifers, but rather that permits are to be issued in response to applications for facilities (reasonably required by the public necessity) that assure safe and sanitary disposal of solid waste without unreasonable danger to clean air and water resources;
Satisfied that this application does assure safe and sanitary disposal of solid waste, without unreasonable danger to clean air and water resources (notwithstanding that it does not exclude every conceivable danger to the Chicot Aquifer):... that ... the conceivable leakage of leachate from the non-hazardous waste in the landfill into the aquifer, through some breach of the high-density polyethylene barrier's integrity and then through the compacted soil component and then through the clay layer overlying the aquifer, could not be excluded but only slowed by thicker overlying clay;
Satisfied, also, that the "health, safety, and welfare of the people" require the prompt addition of some safe and sanitary landfill within reasonable reach of the parishes of Lafayette, St. Martin and Iberia under "strictly enforced programs for the safe and sanitary disposal of solid waste";
Satisfied, finally, that the risk of conceivable danger to the Chicot Aquifer is outweighed by the benefit to public health, safety and welfare of a needed and essentially safe and sanitary solid waste disposal facility;
Therefore, as primary public trustee, in respect to this application, of the environment,... finding that American Waste and Pollution Control Company permit application APA AW 890001 meets every requirement of Louisiana statute and regulation and that the proposed facility will well serve the health, safety, and welfare of the people,

*193 [WILLIAM V. REDMANN] HEREBY GRANTS American Waste and Pollution Control Company permit application APA AW 890001.

SECRETARY'S DUTIES
The Louisiana regulatory framework for environmental protection is based on state constitutional provisions and the public trust concept. La. Const. art. IX § 1.
The Louisiana Supreme Court in Save Ourselves, Inc. v. Louisiana Environmental Control Commission,[4] 452 So.2d 1152, 1156-1157 (La.1984), explained the interrelationship of the constitutional, statutory, and regulatory requirements, as follows:
[T]he Natural Resources article of the 1974 Louisiana Constitution imposes a duty of environmental protection on all state agencies and officials, establishes a standard of environmental protection, and mandates the legislature to enact laws to implement fully this policy. La. Const. art. IX § 1....
....
The Constitutional standard requires environmental protection "insofar as possible and consistent with the health, safety, and welfare of the people." La. Const. art. IX § 1. This is a rule of reasonableness which requires an agency or official, before granting approval of proposed action affecting the environment, to determine that adverse environmental impacts have been minimized or avoided as much as possible consistently with the public welfare. Thus, the constitution does not establish environmental protection as an exclusive goal, but requires a balancing process in which environmental costs and benefits must be given full and careful consideration along with economic, social and other factors.
The statutory standard requires environmental protection that "will assure safe treatment, storage and disposal [of hazardous wastes] without substantial risk to the environment...." La.R.S. 30:1141....
The constitutional-statutory scheme implies several other important principles. Since the ECC [now DEQ], in effect, has been designated to act as the primary public trustee of natural resources and the environment in protecting them from hazardous waste pollution, it necessarily follows that the agency must act with diligence, fairness and faithfulness to protect this particular public interest in the resources. (Citations omitted.) Consequently, the commission's role as the representative of the public interest does not permit it to act as an umpire passively calling balls and strikes for adversaries appearing before it; the rights of the public must receive active and affirmative protection at the hands of the commission. (Citations omitted.)
....
The environmental protection framework vests in the commission a latitude of discretion.... Environmental amenities will often be in conflict with economic and social considerations. To consider the former along with the latter must involve a balancing process. In some instances environmental costs may outweigh economic and social benefits and in other instances they may not. This leaves room for a responsible exercise of discretion and may not require particular substantive results in particular problematic instances. (Citations omitted.)
....
The agency is required to use a systematic, interdisciplinary approach to evaluation of each hazardous waste project or facility. La.R.S. 30:1141. In determining whether the proposed project fully minimizes adverse environmental effects, the commission necessarily must consider whether alternate projects, alternate sites, or mitigative measures would offer more protection for the environment than the project as proposed without unduly curtailing non-environmental benefits. (Citations omitted.)
Subsequent to the Louisiana Supreme Court's decision, DEQ formulated the holding into five "IT Decision" questions that are presented to applicants to address along with the other items necessary to complete their *194 applications for permits. In Blackett v. Louisiana Department of Environmental Quality, 506 So.2d 749, 754 (La.App. 1st Cir.1987), a suit involving a permit for a solid waste (as contrasted with hazardous waste) landfill, this court listed the questions, as follows:
First, have the potential and real adverse environmental effects of the proposed facility been avoided to the maximum extent possible? Second, does a cost benefit analysis of the environmental impact costs balanced against the social and economic benefits of the proposed facility demonstrate that the latter outweighs the former? Third, are there alternative projects which would offer more protection to the environment than the proposed facility without unduly curtailing non-environmental benefits? Fourth, are there alternative sites which would offer more protection to the environment than the proposed facility site without unduly curtailing non-environmental benefits? Fifth, are there mitigating measures which would offer more protection to the environment than the facility as proposed without unduly curtailing non-environmental benefits?

SCOPE OF REVIEW
In addition to detailing the duties of DEQ, the Louisiana Supreme Court in Save Ourselves also delineated the scope of review to be employed by this court when a decision of the DEQ secretary is before us on appeal: the standards of judicial review provided by LSA-R.S. 49:964 are to be applied by analogy. Pursuant to Section 964, this court may affirm the decision of the secretary or remand the case for further proceedings; or we may reverse or modify the decision if substantial rights of the appellants have been prejudiced because the administrative findings and decisions are: "(1) in violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or (6) manifestly erroneous in view of the reliable, probative, and substantial evidence on the whole record. La.R.S. 49:964 G." Save Ourselves, 452 So.2d at 1158.
Although the duties of the DEQ secretary entail a particular sort of careful and informed decision-making process of a quasi-judicial nature, the duties are nonetheless judicially enforceable. In reviewing a decision of the DEQ Secretary, this court should not reverse a substantive decision on its merits unless it be shown that the actual balance of costs and benefits that was struck was arbitrary or clearly gave insufficient weight to environmental protection. However, if the decision was reached without individualized consideration and balancing of environmental factors, it is this court's responsibility to reverse. Save Ourselves, 452 So.2d at 1159.
Furthermore, we are authorized by statute (Section 964 G) to remand the case for further proceedings. The jurisprudence has required that the administrative agency make basic findings supported by evidence and ultimate findings, which flow rationally from the basic findings, and also that the fact finder articulate a rational connection between the facts found and the order issued. Save Ourselves, 452 So.2d at 1158, and cases cited therein. The requirement is particularly cogent in a contested environmental case where the agency performs as a public trustee and is duty bound to demonstrate that it has properly exercised the discretion it enjoys by constitutional and statutory provisions.
We have held that decisions need not be of "ideal clarity" if the agency's findings, reasons, and exercise of discretion are necessarily and clearly implied by the record. See Blackett, 506 So.2d at 755. However, we cannot supply a finding from the evidence or a reasoned basis for the DEQ secretary's action that the DEQ secretary has not found or given. Save Ourselves, 452 So.2d at 1160.

REMAND NECESSARY
We cannot determine from the record that the Secretary pro tempore fully conducted the function of balancing the benefits of the proposed project at Cade II against the risk to the environment, particularly the Chicot Aquifer. Although the Secretary pro tempore *195 provided us with a written decision, he did not list his basic findings or his ultimate findings, as required by the Louisiana Supreme Court in Save Ourselves. Nor did the Secretary pro tempore articulate a rational connection between his factual findings and his order. Instead, his decision is replete with conclusions without bases therefor. He concludes that the risk of conceivable danger to the Chicot Aquifer is outweighed by the benefit to the public to be provided by the Cade II project, but he does not tell us why. Indeed, it would have been difficult, if not impossible, for the Secretary pro tempore to have considered a basis for the risk-benefit analysis because he was not provided by the DEQ staff or American Waste with information on possible solid waste facility sites outside the tri-parish area, despite the fact that the ordered permit allows solid waste from the entire state, up to 12,000 tons per week, to be disposed of at Cade II.
Furthermore, we find that the Secretary pro tempore misstated the test to be used by the agency in determining how much of a threat the proposal was to the aquifer. The Secretary pro tempore avoided requiring "maximum protection" of the water resources and was satisfied with "no unreasonable danger" to the aquifer. However, the Save Ourselves opinion requires that DEQ determine that the adverse environmental impacts have been "minimized" or "avoided as much as possible" consistently with the public welfare.[5]
Nor can we compensate for the deficiencies in the decision rendered by the Secretary pro tempore by looking to the record because we find that the record is deficient in its answer to the following "IT decision" question: "Are there alternative sites which would offer more protection to the environment than the proposed facility site without unduly curtailing non-environmental benefits?"
At the public hearing for Cade II, several citizens complained of DEQ's failure to consider sites in other areas where the clay underlying the proposed landfill over the Chicot Aquifer would be thicker.[6] The citizens pointed out that the American Waste proposal for Cade II could provide a bottom layer of clay ranging from three to five feet, whereas there were "other sites" where clay was as much as 100 feet deep.[7] One citizen who questioned American Waste's failure to consider sites in other parishes was Carol Lagarde of St. Martinville, Louisiana. She stated:
Waste Management's [American Waste's] application states that the Cade site was chosen because it was centrally located for the cities of Lafayette, New Iberia and St. Martinville. Waste Management did not even consider any sites that did not meet that criteria[,] yet this application is not for a landfill to serve just these three cities or these three parishes. It is supposed to serve the entire State.
There's a contradiction here. If it serves the entire State, why does it need to *196 be located so carefully between Lafayette, New Iberia and St. Martinville? Waste Management says it has to be here to serve this market, but the three parishes generate only one-third[8] of the 12,000 tons of garbage this landfill is supposed to receive per week.
If the garbage is coming from the whole State, why not pick a spot that is more centrally located to serve the whole State or better yet, with the whole State to choose from, why not pick the best geological site, the one that offers the best groundwater protection instead of this one where the ground water is located only three feet from the bottom of the landfill? (Emphasis supplied.)
What actually happened was that Waste Management picked this site with the tri-parish service area in mind and then they got greedy and decided they wanted a super landfill to take garbage from the whole State. When they made that change they completely destroyed the line of reasoning they used to choose the site in the first place.
It wasn't a very good line of reasoning anyway[,] but now there is no logic at all to support the choice of this particular site for a Statewide landfill.
One of American Waste's attempted responses to the issues raised at the public hearing was to submit for the record the opinions of Dr. Dennis Ehrhardt, a planning consultant with experience in teaching courses in environmental planning. Dr. Ehrhardt responded to the question concerning alternative sites with a capsule analysis of the "IT decision" response previously filed with DEQ by American Waste as part of its application[9] and with his own observations that the site was "ideal." However, Dr. Ehrhardt based his conclusion on the facts that the service area was the three Acadiana parishes, that the site was centrally located to those three parishes, and that the site was serviced by existing roadways.
Neither American Waste's initial "IT decision" nor Dr. Ehrhardt's supplemental response addresses the failure of the applicant and DEQ to investigate sites outside the Cade area and to include within the evaluation of the sites pertinent geologic data. American Waste explained in its initial response that constraint mapping is the best way to identify an acceptable site for development and that those sites which are near the areas of waste generation and have good access are preferred. This approach, according to American Waste, "simply dictates that a search for environmentally sound sites will begin in a proper area to serve a given region." However, it appears to us that when the area is geographically limited prior to considering generally known, subsurface geologic factors, the primary mission of DEQ is thwarted before it is begun.
For the foregoing reasons, we hold that the order of the Secretary pro tempore was issued erroneously without proper evaluation *197 of alternative sites to determine comparative environmental impact. Accordingly, the order of the Secretary pro tempore is vacated and set aside; this action is remanded to the Department of Environmental Quality for further proceedings consistent with this opinion. Costs of this appeal are assessed against American Waste.
ORDER VACATED; REMANDED.
NOTES
[1] Appellee, American Waste, asserts that the appeal was untimely on the ground that War on Waste filed a writ application with this court, instead of an appeal with DEQ. The action we took on the writ application, No. 92 CW 0230, to remand the case to DEQ for treatment as an appeal, is based on the rationale of In re Howard, 541 So.2d 195 (La.1989). We are satisfied that the reasoning employed in that case is sufficiently cogent when applied in the context of appellate review of an agency decision. Accordingly, we find that there is no merit to American Waste's contention that this appeal is not properly before us.
[2] A threshold issue on standing to appeal has been raised by a "Motion to Dismiss Appeal" filed by American Waste on August 6, 1993, after our initial decision in In re Carline Tank Services, Inc., 92 CA 0604, 626 So.2d 358 (La.App.1993). American Waste asserts that the grant of a standard solid waste permit is not a final decision or order by the DEQ secretary and is not appealable. Therefore, according to American Waste, War on Waste lacks standing to bring this appeal. However, subsequent to our original opinion in Carline, this court denied a rehearing and rendered a lengthy, explanatory opinion, In re Carline Tank Services, Inc., No. 92 CA 0604, slip op. (Aug. 13, 1993). In the second opinion, we stated:

Thus, under Delta Bank [& Trust Co. v. Lassiter, 383 So.2d 330 (La.1980)], either of two tests is applied to the facts of a particular case to determine whether an action complained of is a "decision or order" and, therefore, appealable. The first test concerns whether the party aggrieved is claiming a constitutionally protected right, such as a liberty or property right. When governmental action deprives a party of such a right, procedural due process (encompassing the right to a hearing, notice, record, and judicial review) applies.
....
[A]ny allegation in any pleading by any citizen suggesting that their health, property or liberty interests would be affected by a final decision or order of the secretary is a sufficient pleading to put before appellate courts a constitutional right.
In re Carline Tank Services, Inc., 92 CA 0604, slip op. at 1-2, 8 (Aug. 13, 1993).
The appellants in the instant case are citizens of the Acadiana area who are asserting that the proposed landfill at Cade II threatens their water supply, thus asserting health and property rights protected by the Louisiana Constitution. The appellants are entitled to appeal under the first test mentioned in Carline.
See also Matter of BASF Corp., 533 So.2d 971 (La.App 1st Cir.1988), wherein this court held that citizens' groups had status as "aggrieved" parties with a real and actual interest and a right to appeal in a case involving an assessment of a fine against a violator of the state's air quality regulations.
[3] Throughout his decision, Hearing Officer Landry refers to Secretary Templet as "Director." [Footnote added.]
[4] Also referred to as "IT Decision" in administrative agency terminology.
[5] If we were to create a scale of zero to 10 for "Protection of the Chicot Aquifer," with maximum protection being at zero and unreasonable danger being anything over five, under the Secretary's method Cade II's protection afforded by its engineered liners and leachate collection systems might rate a four. However, to be consistent with Save Ourselves we must search for alternate projects and alternate sites that could achieve a one or two. Only after a determination that such alternates were either unavailable or precluded by the risk-benefit analysis would the "not unreasonable" four be acceptable.
[6] We note that in In re CECOS International, Inc., 574 So.2d 385 (La.App. 1st Cir.1990), writ denied, 576 So.2d 18 (La.1991), one of the grounds for the denial of a permit for a hazardous waste facility was that the applicant did not adequately investigate the possibility of alternative sites for its proposed facilities and did not demonstrate that the proposed site was better suited for land disposal of hazardous wastes than other sites. We further note that in CECOS, although the record reflected that the nearest regional aquifer was approximately 250 feet below the proposed facility, the permit was denied because the inherently deficient geology of the site made continued disposal of hazardous waste unwise and an unnecessary risk to the citizens of Louisiana.
[7] The American Waste application provides for a minimum of 5.5 feet of natural in-place clay remaining beneath the facility. However, American Waste admits there may be areas in Lafayette Parish with 100 feet of clay, countering with the argument that these "may be totally unsuitable." Nevertheless, the record is devoid of an investigation into other possible sites outside the Cade area.
[8] Actually, according to the figures provided by American Waste, only 3,100 tons per week, one-fourth of the allowable solid waste, is generated currently in the tri-parish area. Additionally, American Waste admits that the permit will allow solid waste from the entire state to be dumped at the Cade II facility. [Footnote added.]
[9] Dr. Ehrhardt explained that constraint mapping had been used to identify 40 possible sites. From the 40 possible sites, eight candidate sites were selected. After Cade I was rejected, the site for Cade II was selected.

In a revised "Site Selection and Response to the `IT' Decision" dated November, 1988, American Waste described its process as follows:
The evaluation of potential sites included careful consideration of the protection of environmental and other non-environmental resources. The process began with constraint mapping of the Acadiana three parish area using environmental and socio-economic criteria, then progressing to preliminary geotechnical investigations and analyses of the more favorable sites to verify subsurface conditions....
Selection Process: The first step in the site selection process was to identify the service area: the geographic region to be served by the proposed landfill. The primary service area ... includes the three Acadiana Parishes of Lafayette, St. Martinville (sic) and New Iberia (sic). A target area within the service area was identified for pursuing candidate site locations.... This area was chosen to provide a centralized location, to minimize the adverse effects of long distance hauling. A major consideration is accessibility of the disposal site by existing adequate roadways.