657 So.2d 633 (1995)
In the Matter of: BROWNING-FERRIS INDUSTRIES PETIT BOIS LANDFILL.
No. 93 CA 2050.
Court of Appeal of Louisiana, First Circuit.
June 23, 1995.
Rehearing Denied July 25, 1995.
Daria Burgess Diaz, New Orleans, for appellant SCOPE.
Jackie Marve, Baton Rouge, for appellee State of La. thru the Dept. of Environmental Quality.
*634 Samuel O. Buckley, III, Michael Chernekoff, Judith Windhorst, New Orleans, for appellee BFI.
Before LOTTINGER, C.J., and SHORTESS and CARTER, JJ.
LOTTINGER, Chief Judge.
Sweetlake Citizens Opposed to Polluted Environment (SCOPE) have appealed the decision of the secretary of the Department of Environmental Quality (DEQ) to grant a solid waste permit to Browning-Ferris, Inc. (BFI).

FACTS
On March 27, 1989, BFI submitted a permit application to the Louisiana Department of Environmental Quality (DEQ or the Department), seeking authorization for the construction and operation of a solid waste disposal facility in Calcasieu Parish, Louisiana. The permit application for the Petit Bois facility was received and reviewed by DEQ's Solid Waste Division. (See LAC 33:VII.1107).
After reviewing the permit application for technical compliance and allowing BFI to cure technical defects in the application, DEQ's Solid Waste Division thereafter noticed and conducted a public hearing in Calcasieu Parish on February 28, 1991, to receive public comments and views regarding the proposed Petit Bois facility. Written comments were accepted from the public through April 1, 1991. Appellants, who are members of an organization known as Sweetlake Citizens Opposed to Polluted Environment (SCOPE), attended the public hearing and submitted oral and written comments in opposition to the proposed landfill.
Upon review of the comments received, the Solid Waste Division prepared a Responsive Summary, which recommended that the permit be granted based upon its regulatory compliance. In June of 1991, a draft permit was prepared and submitted to then DEQ Secretary Paul H. Templet.
Upon reviewing of the draft permit, Secretary Templet, in October of 1991, formed an ad hoc review committee comprised of DEQ staff members not involved in the initial review to address five areas of particular concern: (1) flooding potential at the proposed site; (2) wildlife concerns; (3) groundwater concerns; (4) need for the facility; and (5) the alternative sites evaluation process.
The various committee members thereafter investigated the issues assigned to them and provided Secretary Templet with written reports addressing these areas of concern. Upon review of these reports, Secretary Templet, by letter dated December 6, 1991, informed BFI that he was denying BFI's permit request, and further cited four reasons for his denial: (1) lack of need; (2) inadequate consideration of alternative sites; (3) proximity to a wildlife refuge; and (4) the proposed site's potential for flooding.
BFI challenged the denial, and on December 18, 1991, requested an adjudicatory hearing pursuant to La.R.S. 30:2024(A). SCOPE was allowed to intervene in this matter and participated in a five-day adjudicatory hearing which was held on July 27-31, 1992. On November 9, 1992, DEQ Hearing Officer Herman Robinson (Hearing Officer)[1] upheld former Secretary Templet's decision to deny the permit.
On December 9, 1992, BFI mailed to the DEQ Division of Administrative Hearings a Motion for Review of Decision of Hearing Officer pursuant to La.R.S. 30:2018(D). This motion was opposed by SCOPE.
On January 29, 1993, then DEQ Secretary Kai Midboe, Templet's successor, issued an order wherein he agreed to review the decision of the Hearing Officer. This order further directed the Assistant Secretary for the Office of Solid and Hazardous Waste, Glenn Miller, to appoint and chair a task force of DEQ officials who would investigate and make a recommendation on the four issues cited by Templet in his denial of the permit. All parties involved were invited to participate in the investigation and to make their *635 own recommendations to Secretary Midboe as to the findings of the task force.
On May 11, 1993, Assistant Secretary, Glenn Miller, submitted a memorandum of recommendations to Secretary Midboe. Thereafter, Secretary Midboe, in a written decision dated June 4, 1993, overruled his predecessor and the Hearing Officer and held that BFI was entitled to the permit for the Petit Bois landfill, provided it complied with certain conditions. The conditions imposed by Secretary Midboe were that: (1) the facility comply with the requirements of new solid waste regulations promulgated February 20, 1993; (2) BFI re-route a ditch traversing the facility, and ensure that concerns regarding flooding upstream or downstream from the facility, as raised by SCOPE in its comments to the task force, be resolved to the satisfaction of the local drainage district; and (3) BFI develop and implement a plan, to be approved by the U.S. Fish and Wildlife Service, that will isolate the mini-refuge so as to eliminate probable adverse impacts from the operations of the Petit Bois landfill.
From the granting of the permit application to BFI, SCOPE has appealed. DEQ opposes this appeal and now supports the issuance of the permit to BFI.

ISSUES
On appeal, SCOPE presents the following assignments of error:
(1) The Secretary erred in granting BFI a permit in light of the inadequacy of BFI's alternative site analysis;
(2) Because BFI cannot eliminate the landfill's probable adverse impact on the adjacent wildlife refuge as required by DEQ regulations, the Secretary erred in granting BFI the permit;
(3) The Secretary, in granting the permit, abrogated his public trust responsibilities;
(4) There is no need for the BFI landfill; therefore, the granting of a permit to BFI is an abuse of discretion;
(5) The proposed site is prone to flooding; therefore, the granting of a permit to BFI is an abuse of discretion;
(6) There is no evidence to support the Secretary's contention that rerouting the ditch which traverses the proposed landfill site would reduce flooding at the landfill site; therefore, the Secretary's decision to reroute the ditch is arbitrary and capricious and constitutes an abuse of discretion;
(7) The Secretary's decision is contrary to law, unsupported by the record, arbitrary and capricious, and manifestly erroneous.

CONSTITUTIONAL AND STATUTORY AUTHORITY
The concept that the natural resources of the state constitute a public trust which "shall be protected, conserved and replenished"[2] was first recognized in the Louisiana Constitution of 1921 and thereafter retained in Article IX, Section 1 of the Louisiana Constitution of 1974, which provides:
The natural resources of the state, including air and water, and the healthful, scenic, historic, and esthetic quality of the environment shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people. The legislature shall enact laws to implement this policy.
This provision "imposes a duty of environmental protection on all state agencies and officials, establishes a standard of environmental protection, and mandates the legislature to enact laws to implement fully this policy." Save Ourselves, Inc. v. Louisiana Environmental Control Commission,[3] 452 So.2d 1152, 1156 (La.1984). The Louisiana Supreme Court has interpreted this constitutional standard as a "rule of reasonableness" which "requires a balancing process in which environmental costs and benefits must be given full and careful consideration along with economic, social and other factors." In the Matter of American Waste and Pollution *636 Control Company, 93-3163, p. 7 (La. 9/15/94); 642 So.2d 1258, 1262 (quoting Save Ourselves, 452 So.2d at 1157).
Pursuant to this public trust mandate, the legislature in 1979 passed the Environmental Affairs Act, (Act 449 of 1979)[4], which established within the Department of Natural Resources (DNR), the Environmental Control Commission, which was specifically charged with such duties as promulgating regulations, accepting and reviewing permit applications to operate hazardous waste facilitiesduties formerly exercised by the secretary of the DNR.
This act was subsequently amended by the legislature in 1983 and renamed the Environmental Quality Act. (1983 La. Acts No. 97). See also, Save Ourselves, 452 So.2d at 1154 n. 3. As a result of this legislation, the Department of Environmental Quality (DEQ) was created and assumed responsibility for environmental protection and regulation within the state. DEQ has specific jurisdiction over solid waste disposal regulation as well as the permitting of all solid waste disposal facilities within the state. La.R.S. 30:2011(A)(1); La.R.S. 30:2154(B)(2). This statutory framework places on the DEQ secretary the burden of exercising responsible discretion to determine each permit application's substantive result. In the Matter of American Waste, p. 9; 642 So.2d at 1262. In making a determination relative to the granting or denying of permits, the Secretary "shall act as the primary public trustee of the environment, and shall consider and follow the will and intent of the Louisiana Constitution and Louisiana statutory law." Id. at 1262 (quoting La.R.S. 30:2014(A).)

STANDARD OF REVIEW
As our supreme court noted in Save Ourselves, adjudications by an administrative agency are generally subject to judicial review under La.R.S. 49:964 of the Louisiana Administrative Procedure Act (LAPA); however, as the court pointed out, in 1982, the legislature amended Section 1072(B) of the Environmental Affairs Act (now La.R.S. 30:2024(C) of the Environmental Quality Act) to provide that a final decision or order of the commission (now the Secretary of DEQ) was appealable to this court instead of the district court as provided by the LAPA. Save Ourselves, 452 So.2d at 1158. This section further states that the provisions of La.R.S. 49:962 and 964 shall not apply to decisions and orders of the commission (now the secretary of DEQ).
The court in Save Ourselves went on to state that since change in the appellate forum for environmental cases appeared to be the only reason for the inapplicability of La.R.S. 49:964, and in light of the fact that use of the LAPA statutory scheme promotes clarity of analysis in environmental cases, the standards of judicial review provided by Section 964 are to be applied by analogy. Save Ourselves, 452 So.2d at 1158; see also, In the Matter of American Waste, p. 18; 642 So.2d at 1265.
Pursuant to § 964, a reviewing court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) in violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or (6) manifestly erroneous in view of the reliable, probative, and substantial evidence on the whole record. La. R.S. 49:964 G.
Save Ourselves, 452 So.2d at 1158.
On review, a court should not reverse a substantive decision of DEQ on its merits unless it can be shown that the Secretary was arbitrary or clearly gave insufficient weight to environmental protection in balancing the costs and benefits of the proposed action. The court must reverse, *637 however, if the decision was reached "without individualized consideration and balancing of environmental factors conducted fairly and in good faith."
In the Matter of American Waste, p. 18; 642 So.2d at 1265-66 (quoting Save Ourselves, 452 So.2d at 1159).
The manifest error test of § 964 G(6) is used in reviewing the facts as found by the agency, as opposed to the arbitrariness test used in reviewing conclusions and exercises of agency discretion. Where there are no factual issues the manifest error test is not used.
Save Ourselves, 452 So.2d at 1159 (citations omitted).
In its Save Ourselves decision (also referred to as the "IT Decision"), our supreme court articulated five issues to be addressed when reviewing an administrative record. In response to this decision, DEQ has formulated these issues into five "IT Decision" questions which applicants must address along with the other items necessary to complete their applications for permits. These questions were elucidated by this court in our decision in Blackett v. Louisiana Department of Environmental Quality, 506 So.2d 749, 754 (La.App. 1st Cir.1987), a similar suit involving a permit for a solid waste landfill. In Blackett, we listed the questions as follows:
First, have the potential and real adverse environmental effects of the proposed facility been avoided to the maximum extent possible? Second, does a cost benefit analysis of the environmental impact costs balanced against the social and economic benefits of the proposed facility demonstrate that the latter outweighs the former? Third, are there alternative projects which would offer more protection to the environment than the proposed facility without unduly curtailing non-environmental benefits? Fourth, are there alternative sites which would offer more protection to the environment than the proposed facility site without unduly curtailing non-environmental benefits? Fifth, are there mitigating measures which would offer more protection to the environment than the facility as proposed without unduly curtailing non-environmental benefits?
Blackett, 506 So.2d at 754; see also, In the Matter of American Waste and Pollution Control Company, 633 So.2d 188, 194 (La. App. 1st Cir.1993).

CONSIDERATION OF ALTERNATIVE SITES
Implicit in the permit application process is the burden placed upon the permit applicant, in this case, BFI, to present sufficient evidentiary proof that the permit should be granted.
In its first assignment of error, SCOPE contends that Secretary Midboe erred in granting BFI a solid waste permit because due to the inadequacy of BFI's alternatives analysis, DEQ could not fulfill its legal obligation to consider whether alternate projects or alternate sites would offer more protection to the environment without unduly curtailing the non-environmental benefits. This was one of the grounds cited by former DEQ Secretary Paul Templet as a basis for his denial of BFI's permit application.
The Hearing Officer upheld Secretary Templet's finding on this issue and concluded that:
18.
BFI's efforts in locating alternative sites for the proposed landfill were inadequate for two reasons. First, the site evaluation methodology was insufficient. Second, while the number of sites considered in the alternative site study was sufficient, however the method of selection of the 17 sites was inadequate.
19.
Instead of recycling the Woodland Hills survey, BFI should have completed a new site survey. The survey used in the Woodland Hills application was designed to compare sites that were between 50 and 150 acres. The Petit Bois minimum size criterion was set at 150 acres. As a result, 8 of the 17 sites were disqualified due to inadequate size.

*638 20.
BFI's site survey should have gone outside the boundaries of Calcasieu Parish. Since the proposed facility would service areas within a 200 mile radius, which includes areas outside of the parish and into Texas, it is likely an alternative site could be found outside the parish boundaries that would serve the area while providing greater protection to the environment. Although there are no regulations which require a site survey to extend beyond parish boundaries, parish lines or state lines should not be considered strict boundaries when it comes to balancing environmental concerns and economic, social, and other factors, as mandated by the IT decision.
Appellee, BFI, correctly notes in brief that since the concept of evaluating alternative sites as a consideration in solid waste permitting was first promulgated in Louisiana as part of our supreme court's holding in Save Ourselves, no clear directive as to the scope of alternative sites evaluation has been put forth.
In granting BFI's Motion for Review of the Hearing Officer's Decision, DEQ Secretary Kai Midboe stated that:
Former Secretary Templet, in making his IT decision, asked the correct questions concerning flooding, locations near a wildlife refuge, siting and need. However, the reason for my granting of the Motion for review of the Decision of the Hearing Officer is that I do not believe that these questions were ever properly answered.
Later, in overruling the decision of former Secretary Templet and the Hearing Officer, Secretary Midboe held that BFI was entitled to the permit and with regard to the siting issue stated:
Over 80% of the industrial solid waste, and 70% of the municipal solid waste that is generated in the five parish area is generated in Calcasieu Parish. Therefore, I do not feel it was inherently unreasonable to limit the search for an acceptable site to Calcasieu Parish. The study looked at 17 sites, and included such factors as proximity to urban areas, airports, the coastal zone, marshes/swamps, rivers/streams, 100-year floodplain, fault lines, salt domes, depth to 200-foot sands, geological conditions and local zoning. The proposed site will comply with all the requirements of the new solid waste regulations recently promulgated by DEQ.
While it appears that BFI did examine various alternative sites, the record reveals that the alternative site study submitted to DEQ in connection with BFI's Petit Bois landfill application was insufficient to allow DEQ to fully consider and thereafter make an informed determination that the site proposed by BFI afforded the best balance of environmental costs versus economic, technical or social benefits.
Through the testimony elicited at the evidentiary hearing in this matter, it was conceded that the alternative sites utilized by BFI in connection with its application in this matter were essentially the same as those included in a 1987 study which BFI submitted in connection with its proposed expansion of the Woodland Hills facility. Of the seventeen sites examined in the 1990 study, sixteen were previously considered in connection with the 1987 Woodland Hills application. The only new site to be considered was the location proposed for the Petit Bois facility. All were situated within the geographical boundaries of Calcasieu Parish. The 1990 study automatically eliminated eight sites due to their failure to meet the minimum size criterion of 150 acres. An additional site had been previously permitted in response to the Woodland Hills application and was included solely for informational purposes. The eight remaining sites were evaluated in light of ten criteria on a favorable/unfavorable basis.
John Glenn, the former Administrator of DEQ's Division of Policy Analysis and Planning, testified at the adjudicatory hearing held in this matter that as a member of the review team assembled by Dr. Templet, he was assigned to examine BFI's treatment of alternative sites and how this coincided with the IT decision. Mr. Glenn testified that as a licensed landscape architect with fourteen years experience working with state government on environmental and siting issues, he considered the pass/fail system utilized by BFI in their 1990 site analysis to be *639 a very crude means of evaluating the qualifications of a particular site. Mr. Glenn opined that a numerical evaluation of a site's features like the one utilized by BFI in its 1987 study would provide a reviewer with more detail and make it easier to determine the merits of a particular location. Later, Charles Hedges, an engineering consultant testifying on behalf of BFI, conceded under cross-examination that a numerical ranking system would be much better than a simple pass/fail evaluation.
Of further concern to Mr. Glenn was the fact that while the facility's proposed service area covered a 200-mile radius of Lake Charles, thereby encompassing a good portion of the state as well as portions of Texas, the discussion of alternative sites was limited to those lying within the geographical boundaries of Calcasieu Parish. In Mr. Glenn's opinion, such a limitation left him with the belief that the study may have overlooked other more acceptable sites within a specified radius of Lake Charles merely because they were situated in another parish.
In response, BFI's expert, Paul Miers testified that they did not investigate Beauregard Parish, Calcasieu's neighbor to the north, as a possible landfill site due to the close proximity of the underlying Chicot Aquifer and the presence of recharge zones. With regard to the availability of sites outside of Calcasieu Parish, the siting study submitted in connection with the BFI application concedes that no out of parish sites were considered. The study defends this by asserting
[t]he areas west of Calcasieu Parish are in another state, e.g., Texas. The areas south of Calcasieu Parish are near to or in the coastal zone. Areas to the north are too far from the center of population to be economically feasible for transportation of wastes from generators to the point of disposal. Jefferson Davis Parish is contiguous to the east side of Calcasieu Parish. Jefferson Davis has a permitted facility located ... in the west half of that parish.... It is assumed that public officials and residents of that parish would vehemently object to either the prospect of another side of Calcasieu Parish. Jefferson Davis has a permitted facility located... in the west half of that parish.... It is assumed that public officials and residents of that parish would vehemently object to either the prospect of another site in that parish, ostensibly located near the recently permitted facility, or the prospect of Calcasieu Parish's waste being accepted at that facility to the detriment of its longevity.
After a careful review of the record in this matter, we are not convinced that BFI's 1990 alternative sites study submitted in connection with this matter was sufficient to enable DEQ (formerly ECC) to fulfill its responsibility for insuring "that the environment would be protected to the maximum extent possible consistent with the health safety and welfare of the people." Save Ourselves, 452 So.2d at 1160. While we are aware of no precise means for determining the sufficiency of an alternate sites analysis, it appears inherently unreasonable in the mind of this court to limit consideration of alternative sites to arbitrary geographical boundaries where the potential benefits and risks of the proposed facility will impact a multi-parish, if not a multi-state region.
This is not to say that where a number of acceptable sites are found within a particular parish, that the search for alternative sites must necessarily be expanded so as to encompass the entire service area. See Blackett, 506 So.2d at 755-56. But in cases such as this, where only one of the evaluated sites within the optimum radius merits favorable consideration, the search radius should be expanded so as to incorporate a larger portion of the proposed service area. Based upon the limited alternate site survey before us, we cannot say that the chosen site "will accord the highest level of environmental protection without unduly curtailing non-environmental benefits."
For the foregoing reasons, we hold that Secretary Midboe acted arbitrarily and capriciously in his decision to reverse his predecessor and grant a permit to BFI for the Petit Bois landfill.
*640 Because of our ruling on this assignment of error, we pretermit discussion of all other issues raised by appellant.

CONCLUSION
For the reasons set forth above, the decision by DEQ Secretary Midboe to grant a solid waste permit to BFI for the Petit Bois landfill is hereby reversed and remanded. Costs of this appeal are assessed against appellee, Browning-Ferris, Inc..
REVERSED AND REMANDED.
NOTES
[1] Pursuant to the prior language of La.R.S. 30:2018, persons sitting in this position were referred to as administrative law judges; however, as a result of Section 1 of Act 193, of 1990, which became effective on July 2, 1990, such individuals were redesignated as hearing officers.
[2] La. Const. art. VI section 1 (1921) provided: "The natural resources of the state shall be protected, conserved and replenished."
[3] Also referred to as the "IT Decision" in administrative agency terminology.
[4] La.R.S. 30:2001-2396 (formerly numbered La. R.S. 30:1051-1150.96; see the concordance table preceding La.R.S. 30:2001, as extensive re-numbering resulted pursuant to House Concurrent Resolution No. 247 of the 1987 Regular Session).