PENZATO, J.
Intervenor, Southern Aggregates, LLC (Southern Aggregates), and defendant, Louisiana Department of Environmental Quality (LDEQ), appeal the district court's judgment vacating an air permit for a *921 gravel and sand mining operation in favor of plaintiffs, Save Our Hills, Louisiana Environmental Action Network (LEAN), and Oneil Couvillion[1] , and remanding the matter to LDEQ. For the reasons that follow we reverse the judgment of the district court.
FACTS AND PROCEDURAL HISTORY
This matter began on October 24, 2014, when Southern Aggregates filed an application for an initial minor source air permit (air permit)[2] to construct and operate the proposed Plant 10 Easterly (Plant 10) located on Highway 16 in Denham Springs, Louisiana, in order to strip mine sand and gravel. Plant 10 is located adjacent to Oak Hills Subdivision. Save Our Hills is a non-profit corporation representing the over 224 homeowners located in the subdivision. LEAN is a non-profit corporation serving as a statewide network of environmental and citizen member groups, which works to preserve, protect, and improve the state's land, air, water, and natural resources to protect its members from the threats of pollution. Mr. Couvillion is a resident of Denham Springs and a member of LEAN. (Hereinafter, plaintiffs collectively referred to as "Save Our Hills). In its application to LDEQ, Southern Aggregates requested an air permit authorizing emission of air pollutants associated with mining sand and gravel. Southern Aggregates submitted additional materials to LDEQ on February 19, 2015, July 6, 2015, July 27, 2015, October 28, 2015, and January 14, 2016.
LDEQ received comments from numerous individuals and groups alleging that the sand and gravel mine would cause noise pollution, air and ground water pollution, and health concerns. Many of the complainants also alleged diminution in property values in the Oak Hills subdivision as a result of the Southern Aggregates project. Included with the comments was a study from Ontario, Canada, titled the "Diminution in Price (if any) to Residential Real Estate Located in the Vicinity of an Existing or Proposed Ontario Pit or Quarry." On January 12, 2016, LDEQ conducted a public hearing where several members of the public spoke regarding health, environmental, and economic concerns. LDEQ also received several exhibits pertaining to these same concerns.
LDEQ granted the air permit to Southern Aggregates on September 27, 2016. On November 22, 2016, Save Our Hills filed a petition for judicial review in the Nineteenth Judicial District Court, seeking to have the air permit vacated. Southern Aggregates intervened in the suit. On August 28, 2017, the district court held a hearing. The court issued a written ruling finding that LDEQ failed as public trustee of the environment as required by law. Specifically, the district court found that LDEQ failed to weigh the cost to the neighboring landowners in Oak Hills subdivision as required by law when performing its environmental cost analysis. Pursuant to that ruling, the district court signed a judgment on October 31, 2017, vacating the air permit issued by LDEQ to Southern Aggregates regarding Plant 10 for gravel and sand mining operations and remanding the matter to LDEQ. It is from this judgment *922 that Southern Aggregates and LDEQ appeal.
MOTIONS
We first dispose of several motions filed by the parties in this case, all of which were referred to the merits for consideration.
Motion to Supplement Record with Local Ordinances
Southern Aggregates has requested this court to supplement the record with certified copies of three Livingston Parish Code Ordinances: Article 5, Chapter 9, Section 9-111, Number 14-45 (Exhibit A); Article 5, Chapter 9, Section 9-111, Number 16-14 (Exhibit B); and Article 2, Chapter 5.5, Section 5.5-13 (Exhibit C). Southern Aggregates relies on La. C.E. art. 202 and La. R.S. 13:3712(B), asserting that this court take judicial notice of those ordinances. Louisiana Revised Statute La. R.S. 13:3712(B) provides, in pertinent part:
All courts of record in the state shall take judicial cognizance of the municipal ordinances and parochial ordinances which may be enacted by governing authority of any town, city, municipality, or parish within their respective jurisdictions whenever certified copies of such ordinances have been filed with the clerk of said court.
Southern Aggregates did not include certified copies of the ordinances listed above in the administrative record. However, Southern Aggregates argues that LDEQ was aware of these ordinances, and they were discussed throughout the public comment period. Southern Aggregates also claims that it presented certified copies of the ordinances to this court, which complies with La. R.S. 13:3712(B). In opposing Southern Aggregates' motion, Save Our Hills asserts that La. R.S. 30:2050.21(E) provides a procedure to supplement the administrative record, which neither Southern Aggregates nor LDEQ followed.
The very issue before this court was discussed in Word of Life Christian Ctr. v. West, 04-1484 (La. 4/17/06), 936 So.2d 1226, 1231-32. Relying on its previous decision of Klohn v. Louisiana Power & Light , 406 So.2d 577, 578 (La. 1981), the court noted that it had considered La. R.S. 13:3712 and held that the certified copies of the ordinances "should be made part of the record either before its lodging in the appellate court or ... by the filing of a motion to supplement the record in the appellate court." Word of Life Christian Ctr. , 936 So.2d at 1231 (quoting Klohn , 406 So.2d at 579 ). The court also recognized that in 1988, the Louisiana Legislature enacted La. C.E. art. 202, Judicial Notice of Legal Matters, by Acts 1988, No. 515, § 1, which incorporated the approach of La. R.S. 13:3712 but also extended the statute's scope. Louisiana Code of Evidence article 202 provides, in pertinent part:
A. Mandatory. A court, whether requested to do so or not, shall take judicial notice of the laws of the United States, of every state, territory, and other jurisdiction of the United States, and of the ordinances enacted by any political subdivision within the court's territorial jurisdiction whenever certified copies of the ordinances have been filed with the clerk of that court.
B. Other legal matters. (1) A court shall take judicial notice of the following if a party requests it and provides the court with the information needed by it to comply with the request, and may take judicial notice without request of a party of:
* * *
(c) Ordinances enacted by any political subdivision of the State of Louisiana.
Save Our Hills argues that La. C.E. art. 202 provides for judicial notice of ordinances *923 when the ordinance is submitted for a legal matter, i.e., the status of the law, and submits that the court in Word of Life Christian Ctr. took judicial notice of ordinances because they formed the basis of the suit. Word of Life Christian Ctr. , 936 So.2d at 1232 (the defendant had argued the case was precluded because the plaintiff-parish had not included in the record the ordinances under which it sought relief). However, Save Our Hills claims that the statute for judicial review, La. R.S. 30:2050.21, and La. Const. art. IX, § 1, LDEQ's public trust duties, form the basis of the present suit, not the three ordinances at issue. Save Our Hills also maintains that La. C.E. art. 202 does not govern instances where ordinances would only be relevant to arguments on factual matters, i.e., what LDEQ considered when it decided to issue the air permit to Southern Aggregates. Save Our Hills argues that Southern Aggregates submits the ordinances to dispute the administrative record that shows LDEQ failed to consider some of the ordinances (Exhibits A and B)[3] and gave limited consideration of a local noise ordinance (Exhibit C).
Save Our Hills further argues that a court may not take judicial notice of disputed issues and relies upon Constantin Land Trust v . Pitre Industries, LLC , 16-0993 (La. App. 1 Cir. 7/10/17), 225 So.3d 1089, 1093, writ denied , 17-1644 (La. 11/28/17), 230 So.3d 224. However, Constantin Land Trust involved a pending court suit, not ordinances. Louisiana Code of Evidence article 202 mandates that a court take judicial notice of an ordinance of any political subdivision within its jurisdiction either when the proper certified copy has been filed with the clerk of court or when a party "provides the court any information needed by it to comply with the request." La. C.E. art. 202(A) & (B) ; see Comments-1988 (b). Because Southern Aggregates has requested that this court take judicial notice of three local ordinances and has provided this court with the information needed to comply with the request, we take judicial notice of the three Livingston Parish ordinances, Exhibits A, B, and C, pursuant to La. C.E. art. 202(B), and grant that portion of the motion to supplement the record with those exhibits. City of Hammond v. Parish of Tangipahoa , 07-0574 (La. App. 1 Cir. 3/26/08), 985 So.2d 171, 176-77.
Motion To Supplement Record with Affidavit and Subject Matter Jurisdiction
Southern Aggregates also requests that this court supplement the record with the affidavit of Kevin Black, the vice president and general manager of Southern Aggregates. Mr. Black's affidavit includes facts that Southern Aggregates was issued a minor source permit on September 27, 2016, and that it completed the construction of Plant 10 before August 28, 2017, the date of the district court hearing. Mr. Black states that Southern Aggregates was issued a Sand & Gravel Permit from Livingston Parish in accordance with ordinance Article 5, Chapter 9, Section 9-111, Number 16-14. He also states facts regarding Southern Aggregates' compliance with the permits and ordinance and the operation of Plant 10.
Southern Aggregates filed a motion to supplement the administrative record with the affidavit of Mr. Black before the district court hearing pursuant to La. R.S. 30:2050.21(E), but the district court denied the motion. Southern Aggregates now files this motion to supplement the record with the same affidavit of Mr. Black, arguing *924 that because Plant 10 was already complete at the time of the district court hearing on August 28, 2017, the matter was moot, and the district court did not have subject matter jurisdiction. In its appeal, Southern Aggregates also assigns as error that the district court did not have subject matter jurisdiction because the matter was moot. Therefore, we address both the motion to supplement and the district court's subject matter jurisdiction simultaneously.
Subject matter jurisdiction cannot be waived by the parties, and the lack thereof can be recognized by the court at any time, with or without a formal exception. See La. C.C.P. arts. 3 and 925(A)(6). Citizens Against Multi-Chem v. Louisiana Dep't of Envtl. Quality , 13-1416 (La. App. 1 Cir. 5/22/14), 145 So.3d 471, 475, writ denied , 14-1464 (La. 10/10/14), 151 So.3d 586.
Generally, an appellate court has no jurisdiction to review evidence that is not in the record on appeal and cannot receive new evidence. Niemann v. Crosby Dev. Co. , 11-1337 (La. App. 1 Cir. 5/3/12), 92 So.3d 1039, 1044. An appellate court must render any judgment which is just, legal, and proper upon the record on appeal. La. C.C.P. art. 2164. The record on appeal is that which is sent by the trial court to the appellate court and includes the pleadings, court minutes, transcripts, jury instructions (if applicable), judgments, and other rulings, unless otherwise designated. See La. C.C.P. art. 2127 and 2128 ; Official Revision Comment (d) for La. C.C.P. art. 2127 ; Niemann , 92 So.3d at 1044. We do note that when the evidence sought to be supplemented is material to the determination of whether a court had subject matter jurisdiction over an appeal, this court has granted motions to supplement the record. Fla. Gas Transmission Co., LLC v. Texas Brine Co., LLC , 15-1331, pp. 7-8 (La. App. 1 Cir. 12/22/16), 2016 WL 7407344 (unpublished); Fla. Gas Transmission Co., LLC v. Texas Brine Co., LLC , 15-1332, pp. 9-10 (La. App. 1 Cir. 12/22/16), 2016 WL 7407345 (unpublished).
The sole purpose of the affidavit of Mr. Black is to contest the subject matter jurisdiction of the district court. Southern Aggregates asserts that the district court lacked subject matter jurisdiction because the matter was moot. Southern Aggregates claims that LDEQ issued the minor source permit on September 27, 2016, after which Southern Aggregates constructed and began operation of Plant 10 before the district court rendered its October 31, 2017 judgment.
A moot case is one that seeks a judgment or decree which, if rendered, can give no practical relief. A moot question connotes an issue that has been deprived of practical significance or made abstract or purely academic. If the case is moot, there is no subject matter upon which the judgment of the court can operate. In re Nat. Res. Recovery, Inc ., 98-2917 (La. App. 1 Cir. 2/18/00), 752 So.2d 369, 372, writs denied, 00-0806, 00-0836 (La. 5/26/00), 762 So.2d 1104, 1105. The doctrine of mootness is a recognition that judicial rulings that seek to prohibit certain activities should be susceptible of implementation. When the occurrence has happened, the ruling cannot "reach back in time" and right the wrong done. Id. at 373.
The permit application in the present matter sought to "operate a sand and gravel mining operation at Plant 10" and the air permit granted authorized the operation of Plant 10. Furthermore, the petition for judicial review filed in the district court sought review of the permit "to construct and operate a strip-mining facility...." The operation of Plant 10 is ongoing and its expected lifespan is 8 to 10 years. As the operation of the permitted *925 facility is ongoing, and the petition seeks judicial review of the permit authorizing that facility to operate, we find that the matter before the district court was not moot, regardless of the date of completion of Plant 10. Accordingly, the district court maintained subject matter jurisdiction, and we deny that portion of the motion to supplement the record with the affidavit of Mr. Black.
Motion to File Amicus Curiae Brief
Louisiana Chemical Association (LCA) and Louisiana Mid-Continent Oil and Gas Association (LMOGA) have filed a motion for leave to file an amicus curiae brief. In their motion, LCA asserts that it is a nonprofit corporation composed of 63 member companies with over 100 chemical manufacturing plant sites in Louisiana. LMOGA asserts that it is a nonprofit corporation that represents all aspects of the oil and gas industry, including exploration, production, mid-stream activities, pipeline, refining, and marketing. Both LCA and LMOGA claim that their members have substantial and legitimate interests that may be adversely affected by the decision before this court, and that they intend to provide the court with the concerns of and potential negative consequences to their members. Both also assert that they have read all of the briefs of the parties.
Save Our Hills opposed the motion for leave to file an amicus curiae brief, relying on Uniform Rules-Courts of Appeal, Rule-12.11, which provides:
Amicus curiae briefs may be filed only upon motion by the applicant and order of the court. The motion shall identify the interest of the applicant, state that the applicant has read the briefs of the parties, and state specific reasons why applicant's brief would be helpful to the court in deciding the cases. An amicus curiae may not request oral argument.
We recognize, as we did in Barfield v. Bolotte , 15-0847 (La. App. 1 Cir. 12/23/15), 185 So.3d 781, 784, writ denied , 16-0307 (La. 5/13/16), 191 So.3d 1058, that persons seeking to file an amicus curiae brief must include the "basic requirement of stating specific reasons why the amicus curiae brief would be helpful to or aid this court in deciding the instant appeal." (Emphasis in original). A review of the motion before us reveals that LCA and LMOGA have an interest in the outcome of the case and may be adversely affected by any decision. However, there is no indication how they will aid this court in deciding the instant appeal or how the parties will not sufficiently present all relevant legal arguments on appeal. Therefore, we deny LCA and LMOGA's motion for leave to file an amicus curiae brief.
Save Our Hills has filed a motion for leave to file a response to LCA and LMOGA's motion for leave to file an amicus curiae brief. As we have denied the motion for leave to file an amicus curiae brief, the motion filed by Save Our Hills is denied as moot.
Motion to Strike
Save Our Hills filed a motion to strike arguing that specific portions of the briefs filed by LDEQ and Southern Aggregates refer to extrinsic events and material outside the record in violation of La. R.S. 49:964(F) and La. R.S. 30:2050.21(F), requiring that judicial review of LDEQ permit decisions be confined to the record. Save Our Hills further contends that certain portions of the reply brief of Southern Aggregates are not confined to rebuttal points of Save Our Hills's appellee brief and go beyond the scope of what is permitted in a reply brief pursuant to the Uniform Rules-Courts of Appeal, Rule 2-12.6.
*926 The administrative record does contain Southern Aggregates' Environmental Assessment Statement, which states that it would "comply with all permits as required by parish, state, and federal agencies." At the public hearing on January 12, 2016, Mr. Black, as the representative for Southern Aggregates, explained that Southern Aggregates had applied for all applicable local and federal permits and would comply with Livingston Parish ordinances. Save Our Hills requests that the references to the ordinances in the opposing briefs be stricken. Save Our Hills further requests this court to strike any references to Southern Aggregates' internal review process for selecting alternative sites and the updated gravel reserves of Plants 7, 12, and 15.
An appellate court must render its judgment upon the record on appeal. La. C.C.P. art. 2164. Appellate courts may not review evidence that is not in the appellate record or receive new evidence. Landis Const. Co., L.L.C. v. State , 15-1167 (La. App. 1 Cir. 2/29/16), 199 So.3d 1, 3. Appellate courts do not rely on the arguments in briefs to determine facts of the matter before it. See Collins v. State Through Dep't of Nat. Res. , 16-1195 (La. App. 1 Cir. 4/28/17), 220 So.3d 92, 95, writ denied , 17-0879 (La. 9/29/17), 227 So.3d 289 ; CII Carbon, L.L.C. v. St. Blanc, 99-1043 (La. App. 1 Cir. 7/31/00), 764 So.2d 1229, 1231 n.2, writ denied , 00-2781 (La. 11/27/00), 775 So.2d 1069. "Our opinions are always based on our review of the record in its entirety, and we do not rely on the arguments in brief by either party in determining the facts of the matter before us." CII Carbon , 764 So.2d at 1231 n.2.
As we have found that it is appropriate to take judicial notice of the three ordinances, we do not strike any references thereto by LDEQ or Southern Aggregates. Furthermore, as we do not rely on argument in brief by either party to determine the facts, we do not find it necessary to strike any other references complained of by Save Our Hills.
With regard to Southern Aggregates' reply brief, Rule 2-12.6 of the Uniform Rules of the Louisiana Courts of Appeal states that a reply brief shall be strictly confined to rebuttal of points urged in the appellee's brief. See McGregor v. Hospice Care of Louisiana in Baton Rouge L.L.C. , 09-1355 (La. App. 1 Cir. 2/12/10), 36 So.3d 281, 287 n.2, writ denied , 10-0832 (La. 5/28/10), 36 So.3d 258.
In its reply brief, Southern Aggregates argues that the appeal is moot because the construction of Plant 10 was substantially complete. Save Our Hills argues that reference to "installation" of equipment is a new argument. We do not find that Southern Aggregates has presented a new argument or a new assignment of error in its reply brief, as Southern Aggregates assigned as error that the appeal was moot due to construction and operation of Plant 10 in its original brief and the issue of installation is relevant to construction and whether the appeal is moot. Accordingly, after a thorough review of the motion to strike and the oppositions thereto, we deny the motion to strike.
STANDARD OF REVIEW
In Oakville Cmty. Action Grp. v. Louisiana Dep't of Envtl. Quality , 05-1365 (La. App. 1 Cir. 5/5/06), 935 So.2d 175, 183, this court set forth the applicable standard for our appellate review as follows:
Louisiana Revised Statute 30:2050.21 sets forth the procedure for judicial review of a final permit decision of the [LDEQ]. Judicial review provisions of the Administrative Procedure Act and its standard of review are applicable to *927 [LDEQ] proceedings. [La.] R.S. 30:2050.21(F). Judicial review is conducted by the court without a jury and is confined to the record. [La.] R.S. 49:964(F).
When reviewing an administrative final decision in an adjudication proceeding, the district court functions as an appellate court. The Nineteenth Judicial District Court is vested with exclusive jurisdiction to review final permit actions, final enforcement actions, or declaratory rulings made by the [LDEQ]. [La.] R.S. 30:2050.21(A). Any party aggrieved by a final judgment or interlocutory order or ruling of the Nineteenth Judicial District Court may appeal or seek review to this court. [La.] R.S. 30:2050.31.
A reviewing court may affirm the decision of the agency or remand the case for further proceedings. [La.] R.S. 49:964(G). The court may reverse or modify an agency decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) in violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or (6) not supported and sustainable by a preponderance of the evidence as determined by the reviewing court. [Citation omitted.]
Once a final judgment is rendered by the district court, an aggrieved party may seek review by appeal to the appropriate appellate court. La. R.S. 49:965. On review of the district court's judgment, no deference is owed by the court of appeal to the factual findings or legal conclusions of the district court, just as no deference is owed by the Louisiana Supreme Court to factual findings or legal conclusions of the court of appeal. Thus, an appellate court sitting in review of an administrative agency reviews the findings and decision of the administrative agency and not the decision of the district court. Johnson v. Strain , 2015-0714 (La. App. 1 Cir. 11/6/15), 183 So.3d 562, 564.
On review, an appellate court should not reverse a substantive decision of LDEQ on its merits unless it can be shown that the actual balance of costs and benefits that was struck was arbitrary or clearly gave insufficient weight to environmental protection. Dow Chemical Co. Louisiana Operations Complex Cellulose and Light Hydrocarbons Plants, Part 70 Air Permit Major Modifications and Emission v. Reduction Credits , 03-2278 (La. App. 1 Cir. 9/17/04), 885 So.2d 5, 10, writ denied , 04-3005 (La. 2/18/05), 896 So.2d 34. However, if the decision was reached procedurally, without individualized consideration and balancing of environmental factors conducted fairly and in good faith, it is the court's responsibility to reverse. Save Ourselves, Inc. v. Louisiana Environmental Control Commission , 452 So.2d 1152, 1159 (La. 1984). The test for determining whether an action was arbitrary or capricious is whether the action taken was "without reason." Dow Chemical Co. , 885 So.2d at 10.
LAW AND DISCUSSION
Other than the issue of subject matter jurisdiction, Southern Aggregates designates three assignments of error and LDEQ asserts one assignment of error, all of which pertain to whether the district court erred in finding that LDEQ was required to consider economic impacts to neighboring landowners when conducting a cost-benefit analysis as set forth in Save Ourselves , 452 So.2d at 1157.
*928 In reversing the decision of LDEQ, the district court stated:
[T]he court finds that the decision of [LDEQ] is not supported and not sustainable by a preponderance of the evidence that [LDEQ] upheld its public trustee duty by failing to weigh the cost to the neighboring landowners in the Oak Hills Community as required by law when performing its environmental cost analysis. [LDEQ's] conclusion that the social and economic benefits of this permit significantly outweighed the environmental impact cost cannot be supported without determination of the economic impact the project will or may have upon neighboring landowners.
Under Louisiana law, LDEQ has a constitutional duty to act as the trustee of the environment. Louisiana Constitution article IX, § 1 established the public trust doctrine, which mandated that the natural resources of the state be "protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people," and ordered the legislature to "enact laws to implement this policy." In Save Ourselves, the Louisiana Supreme Court interpreted this constitutional mandate to impose a "rule of reasonableness," which requires LDEQ to determine, before granting approval of any proposed action affecting the environment, that adverse environmental impacts have been minimized or avoided as much as possible consistently with the public welfare. Save Ourselves , 452 So.2d at 1157.
In making a decision, LDEQ is required to make basic findings supported by the evidence and ultimate findings, which flow from the basic findings, and must articulate a rational connection between the facts found and the order issued. Save Ourselves , 452 So.2d at 1159. Based on the Save Ourselves decision, it has been held that LDEQ's written findings of fact and reasons for decision must address whether (1) the potential and real adverse environmental effects of the proposed project have been avoided to the maximum extent possible; (2) a cost-benefit analysis of the environmental impact costs balanced against the social and economic benefits of the project demonstrate that the latter outweighs the former; and (3) there are alternative projects or alternative sites or mitigating measures that would offer more protection to the environment than the proposed project without unduly curtailing non-environmental benefits to the extent applicable. In re Shintech, Inc. , 00-1984 (La. App. 1 Cir. 2/15/02), 814 So.2d 20, 25, writ denied, 02-0742 (La. 5/10/02), 815 So.2d 845 (citing In re Belle Company, L.L.C. , 00-0504 (La. App. 1 Cir. 6/27/01), 809 So.2d 225, 238 ; In re Rubicon, Inc. , 95-0108 (La. App. 1 Cir. 2/14/96), 670 So.2d 475, 483 ).
Both LDEQ and Southern Aggregates argue that LDEQ was not required by the factors listed in Save Ourselves to consider Southern Aggregates' economic impact on neighboring landowners in the Oak Hills subdivision. Both LDEQ and Southern Aggregates also assert that private, economic costs, such as an alleged diminution of property values, are not contemplated as part of those factors, and that only the environmental impact costs must be balanced against the social and economic benefits, without any regard for economic costs. Save Our Hills argues that LDEQ should have but did not consider the social and economic costs in the cost-benefit analysis.
In Save Ourselves, LDEQ's predecessor, the Environmental Control Commission (ECC), issued permits for a major hazardous waste disposal facility on the Mississippi River. The Louisiana Supreme Court held that the record was silent as to whether the ECC considered alternate *929 projects, alternate sites or mitigation measures, or whether it made any attempt to quantify environmental costs and weigh them against social and economic benefits of the project, and remanded the matter to the ECC. Save Ourselves , 452 So.2d at 1160-61. The Louisiana Supreme Court found that, "[s]ince the ECC, in effect, has been designated to act as the primary public trustee of natural resources and the environment in protecting them from hazardous waste pollution, it necessarily follows that the agency must act with diligence, fairness and faithfulness to protect this particular public interest in the resources." Save Ourselves , 452 So.2d at 1157. The Louisiana Supreme Court stated that Louisiana Constitution article IX, § 1 requires environmental protection "insofar as possible and consistent with the health, safety, and welfare of the people." Save Ourselves , 452 So.2d at 1156-57. LDEQ is required "to determine that adverse environmental impacts have been minimized or avoided as much as possible consistently with the public welfare. Thus, the constitution does not establish environmental protection as an exclusive goal, but requires a balancing process in which environmental costs and benefits must be given full and careful consideration along with economic, social and other factors." Save Ourselves , 452 So.2d at 1157.
LDEQ asserts that the primary environmental impact cost addressed in Save Ourselves was potential contamination of the environment. LDEQ claims that the "particular public interest" is the protection of natural resources and the environment, so that it must consider "environmental impact costs" and not economic costs to neighboring landowners. Save Our Hills, however, argues that Save Ourselves requires LDEQ, as the public trustee, to consider economic costs and benefits. Furthermore, Save Our Hills argues that the human environment is part of the environment which must be considered when making permitting decisions.
While LDEQ argues that nothing in Save Ourselves requires it to take into consideration the economic costs to the neighboring landowners, Save Our Hills counters that nothing in Save Ourselves prevents LDEQ from taking into consideration the economic costs to the neighboring landowners. Save Our Hills relies on Blackett v. Louisiana Dep't of Envtl. Quality , 506 So.2d 749, 754 (La. App. 1 Cir. 1987), which set forth the questions the applicant must address to obtain a permit as follows:
First, have the potential and real adverse environmental effects of the proposed facility been avoided to the maximum extent possible? Second, does a cost benefit analysis of the environmental impact costs balanced against the social and economic benefits of the proposed facility demonstrate that the latter outweighs the former? Third, are there alternative projects which would offer more protection to the environment than the proposed facility without unduly curtailing non-environmental benefits? Fourth, are there alternative sites which would offer more protection to the environment than the proposed facility site without unduly curtailing non-environmental benefits? Fifth, are there mitigating measures which would offer more protection to the environment than the facility as proposed without unduly curtailing non-environmental benefits?
This court has recognized the interrelationship of the concepts of alternative sites, alternative projects, and mitigating measures and now considers the three requirements as one. Rubicon , 670 So.2d at 483.
*930 In Blackett, the applicant submitted a report containing a cost-benefit analysis of the environmental impacts balanced against the social and economic benefits. The report specifically noted the potential adverse environmental effects of the facility and described specific protective measures to be integrated into the design and operation of the landfill. The report focused on groundwater contamination, surface water contamination, air (odor and dust) contamination, and methane gas migration. Its conclusion was that the social and economic benefits outweighed the environmental impact costs, if any, of the proposed facility. Blackett , 506 So.2d at 754. In holding that LDEQ's grant of the permit was not arbitrary or capricious, the court stated, "In some instances environmental costs may outweigh economic and social benefits and in other instances they may not. This leaves room for a responsible exercise of discretion and may not require particular substantive results in particular problematic instances." Blackett , 506 So.2d at 755 (citing Save Ourselves, 452 So.2d at 1157 ). A reviewing court "should not reverse a substantive decision on its merits, unless it can be shown that the actual balance of costs and benefits that was struck was arbitrary or clearly gave insufficient weight to environmental protection." Blackett , 506 So.2d at 755 (quoting Save Ourselves , 452 So.2d at 1159 ). While Save Our Hills relies on Blackett, the case did not discuss balancing economic costs and did not require LDEQ to consider economic costs. Instead, the court discussed balancing environmental costs with economic and social benefits, as discussed in Save Ourselves. Therefore, we do not find Blackett supportive of the argument of Save Our Hills.
Save Our Hills also relies on Matter of CECOS Int'l, Inc. ("CECOS") Livingston Facility Permit Application No. LAD00618298, 574 So.2d 385, 392 (La. App. 1 Cir. 1990), writ denied , 576 So.2d 18 (La. 1991), wherein the applicant was denied a permit and complained on appeal that LDEQ had failed to conduct a proper cost-benefit analysis.[4] Save Our Hills maintains that economic costs must be considered based on the court's statement in CECOS Int'l that the cost-benefit analysis included, "information concerning the protection of the environment against contamination and the possibility of increased costs from additional police and fire protection." Id. The court noted that "[e]vidence was available in the record concerning the possibility of contamination migration, contamination to the water recharge zones, and contamination to the deep aquifer." Id. LDEQ received this information from the permit applicant as responses to LDEQ's inquiries. Id. The court held that LDEQ properly determined that the risk and gravity of the possible harm outweighed the social and economic benefits. Id. at 393. We do not find that CECOS requires LDEQ to balance economic costs to neighboring landowners, as the decision was based on the environmental costs outweighing the social and economic benefits. The court's statement noting the evidence before LDEQ did not establish a requirement that such evidence must be presented. A thorough review of the case reveals that the decision of LDEQ to deny the permit was based on the risk of water contamination and harm to the environment outweighing the economic and societal benefits. Id.
*931 Furthermore, in Matter of American Waste & Pollution Control Co., 633 So.2d 188, 195 (La. App. 1 Cir. 1993), writ granted , 93-3163 (La. 3/11/94), 634 So.2d 837, and aff'd and remanded , 93-3163 (La. 9/15/94), 642 So.2d 1258, also relied upon by Save Our Hills, the court remanded the matter to LDEQ since it could not be determined from the record if the function of balancing the benefits of the proposed project against the risk to the environment, particularly an aquifer, was conducted properly. The court specifically stated that "the Save Ourselves opinion requires that [L]DEQ determine that the adverse environmental impacts have been 'minimized' or 'avoided as much as possible' consistently with the public welfare." American Waste , 633 So.2d at 195. The court's requirement that the "environmental impacts" be taken into consideration, however, did not also include economic impacts.
Save Our Hills also briefly argues that Avenal v. State , 03-3521 (La. 10/19/04), 886 So.2d 1085, 1101-02, cert. denied , 544 U.S. 1049, 125 S.Ct. 2305, 161 L.Ed.2d 1090 (2005), supports the proposition that economic benefits are to be balanced against economic costs. However, Avenal involved a constitutional taking against the Department of Natural Resources, the validity of hold harmless clauses in leases both before and after a certain date, and the compensation due. Avenal does not address the cost-benefit analysis that LDEQ is required to perform in granting permits.
Save Our Hills further relies on Matter of Dravo Basic Materials Co., Inc. , 604 So.2d 630, 632 (La. App. 1 Cir. 1992), wherein the court affirmed LDEQ's decision to deny a permit to renew shell dredging in Lake Pontchartrain. One expert economist testified regarding the "economic impact to the state in the event the shell dredging industry was closed." Dravo, 604 So.2d at 635 (emphasis added). His testimony referred to the benefit from shell dredging, while another expert testified as to the flaws in the first expert's reasoning. Dravo , 604 So.2d at 635. LDEQ had reviewed evidence of financial costs from job losses and capital expenditures that denying the permit would cause, as well as the lost "opportunity costs" should the permit be granted, including "values attributable to increased local quality of life related to recreational uses of the lake, increased tourism, potential increases in property values, increased seafood industry, increased tax revenues and the intangible value attributable to the state's enhanced reputation for being environmentally conscious." Dravo , 604 So.2d at 636. The environmental costs before LDEQ included the reduction of the Rangia clam population and changes in the lake bottom to aquatic life; the increased turbidity of the lake and its effect on the lake's environment, including a reduction in light penetration resulting in the reduction of grassbeds; the adverse effect on the production of major food sources for many species in the lake; and the effects of having less consolidated sediment at the bottom of the lake and disturbing heavy metals in the sediment. Dravo , 604 So.2d at 638-40. While LDEQ reviewed the testimony of the expert witnesses, there is nothing in the case to suggest that the denial of the permit was based on economic costs, rather than environmental impact costs or risks to the environment. The court affirmed denial of the permit based on the fact that the environmental costs outweighed the social and economic benefits of shell dredging. Dravo , 604 So.2d at 641.
Therefore, none of the cases relied upon by Save Our Hills stand for the proposition that economic costs must be considered under the cost-benefit analysis required by Save Ourselves. Save Our Hills points to no case that has defined environmental *932 impact costs to include economic costs to neighboring landowners. Instead, it is the environmental costs which must be balanced against the social and economic benefits. American Waste , 642 So.2d at 1266 (clean air and water resources at issue). LDEQ must "determine that adverse environmental impacts have been minimized or avoided as much as possible consistently with the public welfare." Save Ourselves , 452 So.2d at 1157. Environmental harm cannot always be quantified as easily as the economic benefits, such as those derived from taxes and salaries, so these economic benefits must be balanced against the need for protection of natural resources. Dravo , 604 So.2d at 636. Environmental costs in some cases may outweigh economic and social benefits and in other cases may not. Blackett , 506 So.2d at 755 (groundwater contamination, surface water contamination, air (odor and dust) contamination, and methane gas migration at issue).
Therefore, we find that the trial court committed legal error in finding that "[LDEQ's] conclusion that the social and economic benefits of this permit outweighed the environmental impact cost cannot be supported without determination of the economic impact the project will or may have upon neighboring landowners."
Alternative Sites Analysis
Save Our Hills also argues that LDEQ's evaluation of alternative sites, as required by Save Ourselves, was arbitrary. LDEQ asserts that because Save Our Hills did not file its own appeal or an answer to the appeal, the judgment may not be modified or revised, and the alternative sites argument is improperly raised in this appeal. The October 31, 2017 judgment incorporated the district court's written reasons, which reversed the decision of LDEQ on the basis of the cost-benefit analysis.
Louisiana Code of Civil Procedure article 1918 provides as follows:
A final judgment shall be identified as such by appropriate language. When written reasons for the judgment are assigned, they shall be set out in an opinion separate from the judgment.
Country Club of Louisiana Prop. Owners Ass'n, Inc. v. Dornier , 96-0898 (La. App. 1 Cir. 2/14/97), 691 So.2d 142, 149 (citing Hinchman v. International Brotherhood of Electrical Workers, Local Union # 130, 292 So.2d 717, 720 (La. 1974) ), specifically noted that "our supreme court has held that the language of the second sentence of this article is merely precatory and does not render a judgment, identified as such and complete in every respect, invalid merely because it contains surplus language." Furthermore, although it is a settled rule that an appeal is taken from a final judgment and not from the trial court's reasons for judgment, it is not improper for an appellate court to consider the reasons for judgment in determining whether the trial court committed a legal error. Winfield v. Dih , 01-1357 (La. App. 4 Cir. 4/24/02), 816 So.2d 942, 948 (citing Donaldson v. Universal Engineering of Maplewood, Inc. , 606 So.2d 980, 988 (La. App. 3 Cir. 1992) ).
It is undisputed that an appellee's failure to raise an issue by appeal or in an answer to the appeal precludes an appellate court's consideration thereof. See La. C.C.P. art. 2133 ; Trosclair v. Becnel , 14-676 (La. App. 5 Cir. 9/9/14), 150 So.3d 324, 328. In the present case, Save Our Hills does not seek to have the judgment modified, revised, or reversed, but merely affirmed for reasons different than those given by the district court. Therefore, the issue of alternative sites may properly be considered on appeal even though Save Our Hills has neither appealed nor answered the appeals of LDEQ and Southern *933 Aggregates. See La. C.C.P. art. 2133 ; Barr v. Smith , 598 So.2d 438, 440 n.2 (La. App. 2 Cir.), writ denied , 604 So.2d 998 (La. 1992) (citing Clark v. McDonald's System, Inc. , 383 So.2d 61 (La. App. 2 Cir.), writ denied , 386 So.2d 95 (La. 1980) ; Pernia v. Trail , 519 So.2d 231 (La. App. 5 Cir. 1988), writ denied , 520 So.2d 755 (La. 1988) ).
Save Our Hills argues that LDEQ's evaluation of alternative sites was arbitrary because it did not adequately answer whether there were "alternative sites which would offer more protection to the environment than the proposed facility site without unduly curtailing non-environmental benefits" as is required by the jurisprudence. Rubicon , 670 So.2d at 483 (citing Blackett , 506 So.2d at 754 ); see Am. Waste , 633 So.2d at 195. Save Our Hills asserts that LDEQ used arbitrary geographic limitations, used arbitrary criteria for its alternative sites evaluation, and failed to evaluate known, viable, and available alternative sites.
There is no precise means for determining the sufficiency of an alternate site analysis. Matter of Browning-Ferris Indus. Petit Bois Landfill , 93-2050 (La. App. 1 Cir. 6/23/95), 657 So.2d 633, 639, writs denied , 95-2127, 95-2155 (La. 11/27/95), 663 So.2d 742. Due consideration must be given to alternative sites from an environmental standpoint, not just business and economic concerns. Matter of Supplemental Fuels, Inc. , 94-1596 (La. App. 1 Cir. 5/9/95), 656 So.2d 29, 39. The alternative site study must be sufficient to allow LDEQ to fully consider and thereafter make an informed determination that the site proposed affords the best balance of environmental costs versus economic, technical or social benefits. See Browning-Ferris , 657 So.2d at 638. A court can look at the criteria used by the applicant to evaluate the alternative sites. See Shintech , 814 So.2d at 22.
LDEQ noted that Southern Aggregates "considered [ten] sites based upon criteria associated with mining requirements versus the adverse environmental impacts."[5] Southern Aggregates relied on the following criteria, taking into consideration both economic and environmental aspects: sufficient site acreage and configuration, gravel in paying quantities, proximity to market, availability, limited wetlands, and zoning. Southern Aggregates reviewed ten different sites located in a three-parish area and compared each to the above described criteria, ultimately concluding that Plant 10 was the only site that was available to mine for the necessary sand and gravel while also meeting the other criteria. Plant 10 was practicable at the time of market entry and achieved the least adverse environmental impact among the sites reviewed, as it allowed the ability to avoid considerable impacts to wetlands. LDEQ reviewed the information submitted by Southern Aggregates and the public comments received in concluding that there were "no alternative sites that would offer more protection to the environment than the proposed site without unduly curtailing non-environmental benefits."
Save Our Hills argues that the availability and acreage sizes of other sites were arbitrarily not considered and directs our attention to letters written to LDEQ during the comment period discussing these issues. Save Our Hills maintains that Southern Aggregates had other plants available, namely Plants 7, 12, and 15, which were viable alternative sites.
*934 However, from our review of the record, we find nothing to indicate that these "alternative sites" proposed by Save Our Hills offered more protection of the environment than Plant 10 other than Save Our Hills' own argument that these sites were viable to produce sand and gravel. All the issues raised by Save Our Hills were before LDEQ at the time of its decision to issue the permit. On review, a court should not reverse a substantive decision of LDEQ on the merits unless it can be shown that the actual balance of costs and benefits that was struck was arbitrary or clearly gave insufficient weight to environmental protection. Supplemental Fuels , 656 So.2d at 39. In light of this standard of review, a court encounters significant limitations. Id. If the evidence as reasonably interpreted supports the determination of the administrative agency, its orders will be accorded great weight and will not be reversed or modified in the absence of a clear showing that the administrative action is arbitrary and capricious. The test for determining whether the action is arbitrary and capricious is "whether the action taken is reasonable under the circumstances." Stated differently, the question is whether the action taken was "without reason." Id. Based upon the above standard, we find that there is no clear showing that the decision of LDEQ was arbitrary and capricious.
Save Our Hills, relying on Browning-Ferris , further maintains that LDEQ used "arbitrary geological boundaries" when it adopted Southern Aggregates' analysis that included alternative sites in only three parishes, even though the strip mine had a "service area" of twelve parishes. Browning-Ferris involved a solid waste permit where the court held that LDEQ acted arbitrarily and capriciously in granting the permit because the alternative sites study was insufficient. Browning-Ferris , 657 So.2d at 638. However, the applicant in that case used many alternative sites from a previous study for a different facility where many of the sites failed to meet the required acreage for the project at issue and were located all in one parish. Id. at 638-639. The court noted that it was unreasonable to "limit consideration of alternative sites to arbitrary geographical boundaries where the potential benefits and risks of the proposed facility will impact a multi-parish, if not a multi-state region." Id. at 639. The court added, "[t]his is not to say that where a number of acceptable sites are found within a particular parish that the search for alternative sites must necessarily be expanded as to encompass the entire service area." Id.
We note that Browning-Ferris does not hold that all alternative site analyses must include every parish that a facility may serve. In order to operate a sand and gravel mine, the material must naturally occur. An alternative site analysis may be limited to a specific geographic area where the geographical area is suitable for the project. See Blackett , 506 So.2d at 755-56. Accordingly, while a solid waste landfill was also at issue in Blackett , the court held that an alternative sites analysis limited to a single area was not arbitrary and capricious due to the presence of natural clays required for the project. Id.
The record supports that Southern Aggregates focused its search in a certain area due to the natural resources. The administrative record states, "Southern Aggregates along with various other mining operations mines for sand and gravel in the rich gravel deposits along the Amite River." Blackett also noted "the existence of another landfill already in the area" was evidence of superior geology for the type of landfill at issue. Blackett , 506 So.2d at 756. Furthermore, Southern Aggregates *935 noted the rich gravel deposits located along the Amite River and that most of the twelve parishes, "including the Lafayette and Houma markets that do not have their own sand and gravel resources, and are consequently, dependent upon a local supplier, such as Southern Aggregates." LDEQ accepted this reasoning in determining that "there are no alternative sites that would offer more protection to the environment than the proposed site without unduly curtailing non-environmental benefits." We find that the evidence as reasonably interpreted supports the determination of LDEQ as there is an absence of a clear showing that the issuance of the air permit to Southern Aggregates was arbitrary and capricious.
CONCLUSION
For the above and foregoing reasons, we reverse the October 31, 2017 judgment vacating the minor source air permit issued by Louisiana Department of Environmental Quality to Southern Aggregates. All costs of this appeal are assessed against Plaintiffs, Save Our Hills, Louisiana Environmental Action Network, and Oneil Couvillion.
MOTION TO SUPPLEMENT RECORD GRANTED IN PART AND DENIED IN PART. MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF DENIED. MOTION FOR LEAVE TO FILE RESPONSE TO AMICUS CURIAE BRIEF DENIED; MOTION TO STRIKE DENIED; REVERSED.

Throughout the record and briefs, "Oneil Couvillion" is interchangeably used with "O'Neil Couvillion." As counsel for Mr. Couvillion has filed pleadings on his behalf spelling his name as "Oneil Couvillion" this court will use that spelling.

A minor source has emissions that do not rise to the level of a major source as defined in the Louisiana Administrative Code. LAC 33:III.502 A;LAC 33:III.503A.

We note that Southern Aggregates filed its application in October 2014, which LDEQ received on October 24, 2014. Two of the ordinances, Exhibits A and B, were passed by the Livingston Parish Council on December 11, 2014, and May 12, 2016, respectively.

We note that the jurisprudence refers to a risk-benefit analysis and a cost-benefit analysis interchangeably. To be consistent, we refer to a cost-benefit analysis even when the individual cases use the term risk-benefit analysis.

LDEQ refers to eight sites considered by Southern Aggregates, but the administrative record reveals that Southern Aggregates actually considered ten different locations.